THE SOLVEIG.

(Circuit Court of Appeals, Fourth Circuit.   July 9, 1900.)

No. 350.

MARITIME LIENS—ADVANCES AND CHARGES PAID BY SUBCHARTERER.

No maritime lien exists on a vessel, in the absence of express contract therefor, for advances made to the crew without the knowledge of the master, or for port charges paid, in favor of a charterer for a voyage, whose charter was not with the owners, but with a time charterer, who was

bound by his charter to pay all such charges, and of which fact his subcharterer was charged with notice.

Appeal from the District Court of the United States for the Eastern District of Virginia.

Frederick M. Brown (Butler, Notman, Joline & Mynderse, on the brief), for appellant.

Robert M. Hughes, for appellee.

Before GOFF and SIMONTON, Circuit Judges, and BRAWLEY, District Judge.

BRAWLEY, District Judge. The Danish steamship Solveig was chartered for six months by her owners to Henry T. Knowlton, under a charter party which contained, among other conditions, the following:

"(1) That the owners shall provide and pay for all the provisions and wages and consular, shipping, and discharging fees of the captain, officers, engineers, firemen, and crew; shall pay for the insurance of the vessel; also, for all the cabin, deck, engine-room, and other necessary stores,—and maintain her in a thoroughly efficient state, in hull and machinery, for the service. (2) That the charterers shall provide and pay for all the coals, fuel, port charges, pilotages, agencies, commissions, consular charges, and all other expenses whatsoever, except those before stated, and shall accept and pay for all the coal in the steamer's bunkers on delivery; and the owners shall, on expiration of this charter party, pay for all coal left in bunkers, each at the current market price at the respective ports when she is delivered to them."

The charter party was to be canceled if the steamer was not ready to receive cargo by January 20, 1897, and the charterers were to pay for the use and hire of the vessel at the rate of eight shillings per gross registered ton per calendar month; captain to be under orders and directions of the charterers, and to be removable upon complaint of the charterers, who had the right of subletting the steamship. On April 21, 1897, Miller, Bull & Knowlton, as agents of the time charterer, chartered this steamship to William Johnston & Co. for a voyage from Newport News to Hamburg, to be loaded with a cargo of grain; and while so chartered she was burned at her wharf in Newport News on April 27, 1897, the fire originating on the wharf. The vessel was so much injured as to be incapable of proceeding with her voyage, and was afterwards sold under proceedings instituted by the salvors; and the proceeds of the sale, less the amount decreed to the salvors, is in the registry of the court. This appeal is from a decree of the district court of the Eastern district of Virginia ordering the payment of certain items out of the remnants and surplus arising from the judicial sale of the steamship upon the petition of William Johnston & Co., the items allowed being as follows:

| | |
|---|---:|
| Reporting news of Solveig to persons interested in cargo | $ 26 87 |
| Loans to crew of Solveig | 10 02 |
| Cost of wharfage | 87 72 |
| Port dues | 10 00 |
| | $187 75 |

The master of the ship testified that he did not know William Johnston & Co., and that no advances were made by them, either be-

fore or after the fire, at his request or with his knowledge; and the question to be decided is whether William Johnston & Co. have a maritime lien upon the ship for such advances. If they had not such a lien upon the ship, it would be repugnant to every sound principle to allow the claim against the proceeds. The Lottawanna, 20 Wall. 224, 22 L. Ed. 259. Maritime liens are allowed upon the ship herself, to the amount of the debts contracted in keeping up her existence and usefulness. The necessities of commerce require her to visit places where her owners are not known or are inaccessible, and, the master not being usually of sufficient pecuniary ability to respond to the demands of the voyage, he is the fully authorized agent of the owners; and any debt created by him for the benefit of the ship, to enable her to complete the voyage upon which she is engaged, is secured by a lien upon the ship itself. "The vessel must get on," says the court in The Aurora, 1 Wheat. 96, 101, 4 L. Ed. 46, and "the necessities of commerce require that, when remote from the owners, he (the master) shall be able to subject his owners' property to that liability without which it is reasonable to suppose he would not be able to pursue his owners' interests." And liens thus created by implication or operation of law do not arise when from the circumstances of the case it is clear that no such necessity has existed, and that the supplies or advances were not made upon the credit of the ship or by the authority of the master. In this case there is no privity of contract between the owners of the Solveig and the petitioners. Their contract was with Miller, Bull & Knowlton, who represented themselves as "time-charter agents" of the steamship. By the voyage charter the petitioners were put upon notice of the existence of the time charter, and of all the rights of the owner of the vessel thereunder. An inspection of this time charter would have shown that the owner was not liable for any charges for wharfage or port dues; that the owner was to receive a certain sum per registered ton per month for the hire of the vessel and the port charges, "and all other charges whatsoever" were to be paid by the time charterers. As they had agreed to pay all such charges, they, of course, had no authority to bind the vessel for the same. Such diligence as good faith requires would have enabled these petitioners to ascertain that there was no authority anywhere from the owners to obtain any supplies upon the credit of the vessel. No necessity can be suggested and no reason urged in support of such a maritime lien. The testimony of the master shows that the cargo was taken on board under the supervision of Ellis, the supercargo appointed by Knowlton, the time charterer, and that he had nothing to do with it, except so far as the safety of the vessel and the character of the stowage were concerned. By the terms of the charter party the general owner was to receive so much per month for the hire of his ship, and it was nothing to him whether she carried this cargo or not. The charterer became the quasi owner, and the contract of the petitioners was solely with him. The owner of a chartered vessel is not liable for wharfage. 1 Pars. Shipp. & Adm. 300. In The Aeronaut (D. C.) 36 Fed. 497, Judge Brown says:

"But upon personal dealings with the general owners, or with the charterers, who are the owners pro hac vice, for supplies to be furnished within the same

port or state where the contract is made, the legal presumption is that the dealings are not with the ship or upon her credit, but upon the ordinary personal responsibility of the owners, with whom the dealings are had; and no lien is in such a case sustained, unless a credit of the ship is proved to be within the intention of both parties. There is no legal presumption that aids the libelant in making out a maritime lien. They must stand upon the facts as they existed, and, upon these facts, not only had the charterers, under the circumstances of this case, no authority to charge the ship for these supplies, but there is no evidence that they had the slightest intention of doing so. Nothing in the negotiations or in the ordering of the supplies points to the ship as an intended source of credit, within the common intention, and the charterers could not have contracted on that basis in this case without fraud on the general owners."

The captain of the ship, by the terms of the time charter, was under the orders of the charterers, who were to indemnify the owners from all consequences or liabilities arising from compliance with the same.

The Kate, 164 U. S. 458, 17 Sup. Ct. 135, 41 L. Ed. 512, was a libel against the vessel for coal furnished. There was a time charter party similar in terms to that now under consideration, wherein the charterers were to furnish coals, etc.; and a lien was claimed in virtue of a statute of New York which gave a lien upon the vessel for such supplies "as may be fit and proper for the use of such vessel at the time when the same were furnished," upon debts contracted by the "master, owner, charterer, builder, or consignee." The cases on the subject are reviewed, and the court says:

"When, therefore, supplies are furnished to a vessel in a foreign port, upon the order of the master, nothing else appearing, the presumption is that they were furnished on the credit of the vessel and of the owners, and an implied lien is given. But no such necessity can be suggested, and no such reasons urged, in support of an implied lien for supplies furnished to a charterer, when the libelant at the time knew, or by such diligence as good faith required could have ascertained, that the party upon whose order they were furnished was without authority from the owner to obtain supplies on the credit of the vessel, but had undertaken, as between itself and the owner, to provide and pay for all supplies required by the vessel."

Again:

"If no lien exists under the maritime law when supplies are furnished to a vessel, upon the order of the master, under circumstances charging the party furnishing them with knowledge that the master cannot rightfully, as against the owner, pledge the credit of the vessel for such supplies, much less is one recognized under that law where the supplies are furnished, not upon the order of the master, but upon that of the charterer, who did not represent the owner in the business of the vessel, but who, as the claimant knew, or by reasonable diligence could have ascertained, had agreed himself to provide and pay for such supplies, and could not, therefore, rightfully pledge the credit of the vessel for them."

The Valencia, 165 U. S. 264, 17 Sup. Ct. 323, 41 L. Ed. 710, is to the same effect.

The record in this case shows that there was no express agreement for a lien, and there is nothing in the testimony that warrants the inference that either the master or the charterers agreed to pledge the credit of the vessel. The petitioners were dealing with the time charterers, who, by their agreement, were bound to pay all port charges and "all other charges whatsoever." They could not, without actual fraud, pledge the vessel for the payment of these debts, and

there is no ground to suspect that they did so. The master of the ship certainly did not, for his uncontradicted testimony shows that he had no relations whatsoever with petitioners. There being no actual lien by agreement, and no circumstances from which one can be implied, our opinion is that none exists.

Objection has been made to the right of the petitioners to sue, being the agents of a named principal. Our conclusion renders it unnecessary to consider or determine this point. The decree of the district court is reversed.