## THE BUCKHANNON.

### BERWIND-WHITE COAL MINING CO. v. ROBINSON SHIPPING CO.

(Circuit Court of Appeals, Second Circuit. April 28, 1924.)

No. 337.

1. **Admiralty ☼50—Stipulator held improperly permitted to intervene.**
   Stipulator on bond of claimant of vessel *held* to have no interest in res, and improperly permitted to intervene.

2. **Maritime liens ☼21—That there is mortgage on ship does not prevent or limit owner or agents to pledge credit by incurring lien.**
   That there is a mortgage, and not a preferred mortgage, on a ship, does not prevent or limit right of owner or agents to pledge credit of vessel by incurring a maritime lien, under Merchant Marine Act 1920, § 30 (Comp. St. Ann. Supp. 1923, § 8146¼jjj et seq.), or Lien Law 1910 (Comp. St. §§ 7783–7787).

3. **Maritime liens ☼30—Government contract of sale held not to affect right to lien.**
   That there had been a purchase agreement or contract for sale executed between United States and original purchaser of vessel did not affect right of furnisher of coal to lien, where it was not shown that claimant ever saw or even knew of agreement, under Merchant Marine Act 1920, § 30 (Comp. St. Ann. Supp. 1923, § 8146¼jjj et seq.), or Lien Law 1910 (Comp. St. §§ 7783–7787).

Appeal from the District Court of the United States for the Southern District of New York.

Libel in admiralty by the Berwind-White Coal Mining Company against the steamship Buckhannon, her engines, etc.; the Robinson Shipping Company, claimant. The Ætna Surety & Casualty Company intervened as stipulator on claimant's bond. From an adverse decree, libelant appeals. Reversed and remanded, with directions.

Libelant is a Pennsylvania corporation transacting business in New York City. At the request and by the order of persons acting as agents for Buckhannon's owners, libelant arranged for and procured certain firms or corporations in Gibraltar and Bermuda to furnish the Buckhannon with coal and other necessaries while she was returning to the United States from Mediterranean ports. This libel in rem is brought to recover for what was so furnished.

The steamship had belonged to the United States, and prior to the events above narrated she had been transferred to a corporation, which was presumably the grantor of the claimant herein. We have not before us the form of the bill of sale, either from the United States to its grantee or from that corporation to the present claimant. Presumably before the actual execution of a bill of sale from the United States, an "agreement to purchase"

was reduced to writing, and that agreement is in evidence. The substance of this contract is that the buyer was to pay the government only a small portion of the purchase price at the time of transfer of title, and the balance was to be secured by a purchase-money mortgage.

For the protection of such mortgage the buyer agreed that it would not "suffer or permit to be continued any lien, encumbrance or charge which has or might have priority over the mortgages of said vessel to the seller [the United States]." This contract further provided that it should be "carried as a part of the ship's papers, and that metal plates bearing the words 'United States Shipping Board, mortgagees,' shall be maintained by the buyer in one or more conspicuous places upon said vessel, the location of which the seller shall determine and may change from time to time, and that the buyer shall take such other appropriate steps as designated to it by the seller from time to time, or required by the circumstances, as will give notice to the world that the buyer's right, title, and interest in the said vessel is subject to the said mortgage and to this agreement, and that the buyer has no right, power, or authority to suffer or permit to be imposed on or against said vessel any liens or claims which might be deemed superior to or a charge against the interest of the seller in said vessel."

So far as shown, this purchase agreement was never anywhere recorded. The subsequently executed mortgage contains no reference to or recital of the "purchase agreement," except to declare that it is the condition of the mortgage that the parties thereto shall perform all the provisions of said purchase agreement, but except for this reference the mortgage is in the form ordinary before the creation of what are now known as preferred mortgages, and does not purport to create any maritime lien upon the vessel.

It does not appear that the "metal plates" referred to in the purchase agreement were ever placed upon the Buckhannon, or that the purchase agreement was ever carried as a part of the ship's papers. It is to be noted that the grantee of the United States was not the owner, nor, so far as shown, 'n any way interested in the Buckhannon, at the time of the events giving rise to this litigation. The court below dismissed the libel, and libelant appealed.

Leo J. Curren, of New York City, for appellant.

Theodore L. Bailey, of New York City, for stipulator on claimant's bond (who had been permitted to intervene in the court below).

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). [1] The appearance of the stipulator as an intervener cannot be recognized. The only difference in this regard between this case and that of Paulsen v. The Cartona (C. C. A.) 297 Fed. 827, is that the stipulator himself was permitted to intervene in this cause, instead of those who had given cross-security to the stipulator. It is just as true in this instance as it was in that of the case cited that the stipulator has no interest in the res, and therefore cannot be permitted to appear as an intervener. We have, however, heard and considered the argument of the stipulator's proctor as amicus curiæ.

The ground for decision below and the whole argument in support thereof at bar is the asserted controlling effect of United States v. Carver, 260 U. S. 482, 43 Sup. Ct. 181, 67 L. Ed. 361. For the purposes of this case, there being no difference between the lien law as restated in the Merchant Marine Act of 1920, § 30 (41 Stat. 1000 [Comp. St. Ann. Supp. 1923, § 8146¼jjj et seq.]) and the Lien Law of 1910 (36 Stat. 604 [Comp. St. §§ 7783–7787]) it may be assumed that the Carver decision applies fully to cases arising (as did this one) before passage of the act of 1920.

We assume that this litigation arises under the law of this country as declared and established by the Lien Act, because the libel assumedly rests upon that statute, the answer admits in effect that the libelant furnished, or caused to be furnished, the necessaries in question, and no plea is made requiring investigation of the law of Great Britain, its colonies, or dependencies. Our sole inquiry is, therefore: Does the Carver decision apply?

It is first to be observed that that decision relates to a chartered vessel, and so does The South Coast, 251 U. S. 519, 40 Sup. Ct. 233, 64 L. Ed. 386, and both of these ruling cases merely furnish commentaries (however important) as to the measure of diligence laid upon one furnishing necessaries to a ship where the intended lienor knows, or by the exercise of reasonable diligence might know, that the ship in question was chartered, and by the exercise of the same diligence might ascertain the terms of the charter.

[2] The Buckhannon was not a chartered ship at all; she was owned absolutely by the claimants when the events giving rise to litigation occurred. She was a mortgaged vessel, but it is a point too familiar to need citation that the mere fact that there is a mortgage, and not a preferred mortgage, upon a ship, does not in the least prevent or limit the right of her owner, or that owner's lawful agents, to pledge the credit of the vessel by the incurring of a maritime lien. This is because the maritime lien is superior to the mortgage and takes no cognizance of the mortgage as such.

[3] It is quite true that there had been a purchase agreement or contract for sale executed between the United States and the original purchaser of Buckhannon; but it is not shown that the grantee of that purchaser ever saw or even knew of this agreement, nor does it appear that the conveyance from the government grantee to claimant made any reference to the said contract of sale. Doubtless the claimant, as well as the rest of the world, was affected with knowledge of the mortgage by reason of its recording; but, as above pointed out, it is fundamental that the mere existence of this unpreferred mortgage amounted to nothing so far as the creation of maritime liens was concerned. It is also true that the mortgage contained a reference to the purchase agreement or contract of sale, which might have been traced into the private archives of the United States Shipping Board—this last must remain a supposition, and nothing more—upon this record.

Those urging support of the decree below assert (as they must) that the decree is upheld by a proper interpretation of section 3 of the Lien Act (Comp. St. § 7785), which provides, inter alia, that the agents of an "agreed purchaser in possession of the vessel" may create a lien, but that there shall be no lien when the furnisher of necessaries knew, or could by exercise of reasonable diligence have ascertained, that "because of the terms of an * * * agreement for sale of the vessel" the person giving the order was without authority to bind the vessel therefor. It seems to us perfectly clear that, when the statute speaks first of an "agreed purchaser in possession of the vessel" as one who may personally or by deputy confer a lien, and then requires the furnisher to exercise due diligence to investigate an "agreement for the

sale of the vessel," the reference of the two phrases must be to the same thing; i. e., the purchaser in possession of the vessel must be there under the same agreement as that which the furnisher is required to investigate.

But the claimant and owner of this ship was not in possession under any agreement for the sale of the Buckhannon. Its predecessor in title and possession might possibly have been held to be in possession, not by virtue of his bill of sale, but under the antecedent agreement for sale. The doctrine of merger might render such a holding difficult as to claimant's grantor, but as to this claimant there can be no doubt that he was in possession, not by virtue of any agreement for sale, but solely by an absolute grant or transfer from another and precedent private owner.

No authority is presented or known to us applicable to the facts in this case. We are referred to cases of conditional sale,[1] to others of purchasers in possession under a contract of sale or "purchase agreement,"[2] and to numerous cases of charter (e. g., The Ascutney [C. C. A.] 289 Fed. 802; United States v. Rapid, etc., Co. [C. C. A.] 289 Fed. 803); but none of these cases covers the matter at bar.

We are of opinion (1) that the purchase agreement between the United States and its vendee did not affect, like a covenant going with land, a subsequent owner holding by absolute bill of sale (subject only to an ordinary mortgage); (2) that upon the true construction of the third section of the Lien Act the owner and claimant of the Buckhannon was not at the time of the matters giving rise to this suit an "agreed purchaser in possession." Therefore this case becomes the ordinary one of the owner of a mortgaged vessel pledging its credit in such a manner as to create a maritime lien. That there is nothing in the mere existence of such an unpreferred and nonmaritime mortgage to prevent the creation of a lien is not and cannot be seriously contested. That the persons creating the lien, by asking for the supplies, were entirely within the act, is admitted.

The decree below is reversed, with costs, and the cause remanded, with directions to ascertain libelant's damages.

[1] The Northern No. 44, 1923 A. M. C., 622; Id. (C. C. A.) 296 Fed. 119; 1924 A. M. C. 541; The Princess Matoika, 1924 A. M. C. 303.

[2] Deibert v. United States (C. C. A.) 289 Fed. 805; The Hoxie, 1923 A. M. C. 937.