## INTERNATIONAL REFUGEE ORGANIZATION v. MARYLAND DRYDOCK CO. et al.

### The SAN FRANCISCO.

No. 5969.

United States Court of Appeals
Fourth Circuit.

Argued Nov. 11, 1949.

Decided Jan. 4, 1950.

Francis M. Shea, Washington, D. C. (Warner W. Gardner, Washington, D. C., Arthur W. Murphy, Washington, D. C., and Oliver E. Stone, Washington, D. C., on brief), for appellant.

David R. Owen and Edwin F. A. Morgan, Baltimore, Md. (Semmes, Bowen & Semmes, Baltimore, Md., on brief), for appellee The Maryland Drydock Company.

Before PARKER, Chief Judge and SOPER and DOBIE, Circuit Judges.

PARKER, Chief Judge.

This is an appeal in a suit in admiralty instituted by the Maryland Drydock Company (hereafter called Maryland) against the Panamanian Steamship "San Francisco" to enforce a lien for labor and repairs furnished in converting the vessel from a cargo carrier to a passenger vessel for the transportation of emigrants. The District Court sustained the lien for the sum of $798,346 and ordered the vessel sold. It was purchased at the sale by the lien claimant at the price of $724,000, of which amount there remains in the registry of the court the sum of $692,501.84.

The owner of the vessel is the Republic Steamship Corporation (hereafter called Republic) a corporation of the Republic of Panama, but the appeal here is not by the owner but by an agency of the United Nations, the International Refugee Organization (hereafter called IRO), which had chartered the vessel and advanced $840,000 to Republic on the charter hire. The appeal raises three questions: (1) whether the lien claimed by Maryland is a valid lien in view of the contention that the vessel was purchased with a part of the $840,000 which IRO contends was obtained from it by fraud; (2) whether the lien, if valid, extends to the charge made for changes and additions in excess of the original contract price of $585,000; and (3) whether in any event, IRO is not entitled to a maritime lien, which would share ratably with the lien of Maryland, for such part of the $840,000 as was used by Republic in the purchase of supplies, payment of crew's wages and other expenses necessary to make the vessel ready for sea.

The facts are that one Madeiros, a merchant of Lisbon, began planning in April 1948 with certain officers of the General Engineering and Drydock Company of San Francisco (hereafter called General), to secure a vessel which could be chartered to IRO for the transportation of emigrants. He had some negotiations with respect to the S. S. President Buchanan, on the basis of which he entered into a written agreement with the Preparatory Commission of IRO (called PCIRO) on May 29, 1948, representing that he was the owner of a vessel, called the San Francisco, the name that he proposed to give the Buchanan on her conversion. By the terms of the agreement, PCIRO chartered the vessel for a term of twelve months at $280,000 per month and agreed to advance

the sum of $840,000, to be repaid at the rate of $105,000 per month from the first eight months hire, upon certain conditions as to transfer of flag, insurance, etc., which it is not necessary here to enumerate.

After negotiating this agreement, Madeiros returned to his associates in San Francisco, where he learned that the Buchanan was not available but that the S. S. J. L. Luckenbach of the Luckenbach Steamship Company, then in New York, could be obtained. He and his associates accordingly took over Republic, a corporation which had been previously organized under the laws of Panama, and prepared to have that corporation take over the J. L. Luckenbach for the purpose of chartering her to PCIRO in lieu of the Buchanan. On July 15 and 16 he cabled PCIRO to that effect and suggested that the contract be changed to substitute Republic for Madeiros and the J. L. Luckenbach for the vessel called the San Francisco in the contract. Following this he went to Geneva, Switzerland, where on July 30, he negotiated with PCIRO a modification of the original contract, naming Republic as owner and the "San Francisco ex J. L. Luckenbach" as the vessel which was the subject of the charter agreement. The modified agreement provided that PCIRO would advance the $840,000 to Republic at once and release it against documents showing transfer of flag, certain insurance, and either a Lloyds 100A1 classification or a letter of General certifying that the vessel's conversion would be to that classification. No attempt was made to create a lien on the vessel for the sum advanced, nor was there any limitation upon the manner in which the owner might use or expend it. There was testimony, however, to the effect that Madeiros stated that he needed the money to convert the vessel and provide him with supplies for the service for which she was being chartered. The $840,000 was promptly released to Republic and on August 11 payment of the sum of $475,000 was made for the Luckenbach, title to which was duly transferred to Republic.

The Luckenbach was in New York at the time of her purchase and it was thought unwise to send her around to San Francisco so that the work of conversion could be done by General. Contract was accordingly made between General and Maryland for Maryland to do the work. The contract was made in the name of General, but there is no question that General was acting as agent for Republic in the matter, as the minutes of meetings of directors of Republic clearly show. While title had not been transferred to Republic at the time the contract was made, negotiations then in progress culminated in the transfer, which was made a number of days before work upon the vessel was commenced and before she had arrived in the yards of Maryland.

The contract for the reconditioning of the vessel was oral and was made over the long distance telephone, but it was based, according to the testimony of Maryland's witnesses, upon certain data which they had prepared and had at hand. There is no dispute that the basic price agreed upon was $585,000; but there is a conflict in the testimony as to whether this was to include the cost of changes necessary to be made to obtain a Lloyds certificate or whether such changes were to be paid for in addition to the basic charge. The District Judge, who saw and heard the witnesses, found that additional payment was to be made for such changes. General sent an agent, one Shaw, to be present in Maryland's plant and represent it in negotiations with respect to the changes; and, out of the $213,346 charged for extras, Shaw approved both changes and charges on items amounting to $155,436 and agreed upon the necessity of additional items aggregating $57,910, without agreeing that General should pay for them.

As to IRO's claim of a maritime lien, Madeiros testified that Republic paid for certain stores and supplies for the vessel and wages of the crew that had been brought on from Portugal to operate her when she should be ready to go to sea. IRO contends that it has a maritime lien in the sum of $185,754.67 on account of these items although the evidence offered to establish them is not very definite.

■ On the principal question in the case, the validity of Maryland's lien, there can be no doubt, we think, but that the decision of the District Judge was correct. Labor and materials were furnished by Maryland in converting the vessel from a freight carrier to a passenger vessel; and it was settled in New Bedford Dry Dock Co., v. Purdy, 258 U.S. 96, 42 S.Ct. 243, 66 L.Ed. 482, that such work is to be regarded, not as original construction, but as repairs to the vessel for which a maritime lien arises under the terms of the Act of June 23, 1910, 36 Stat. 604, as amended by the Act of June 5, 1920, 41 Stat. 1005, 46 U.S.C.A. § 971, which provides:

"Any person furnishing repairs, supplies, towage, use of dry dock or marine railway, or other necessaries, to any vessel, whether foreign or domestic, upon the order of the owner of such vessel, or of a person authorized by the owner, shall have a maritime lien on the vessel, which may be enforced by suit in rem, and it shall not be necessary to allege or prove that credit was given to the vessel."

■ The repairs for which the lien is asserted were made upon the orders of General, which was acting under the authority of Republic in giving them. It makes no difference that the contract for the repairs was made in the name of General or that, at that time, title to the vessel had not been acquired by Republic. Republic unquestionably was negotiating for the purchase of the vessel at that time, and General was acting as Republic's agent in contracting for the repairs. Title was in Republic well in advance of the making of the repairs; and the contract between General and Maryland had been expressly recognized by Republic at the meetings of its directors held on August 7 and 12, several days prior to the delivery of the vessel to Maryland for the repairs to be made. All of this is admitted in the brief of IRO, where it is said: "We do not in this court contest that Maryland furnished 'repairs' to the vessel 'upon the order * * * of a person authorized by the owner'. The issue is thus narrowed to our contention that neither Republic as owner nor Gen-

eral as its agent had authority to bind the vessel."

IRO's contention that Republic was without authority to bind the vessel is to the effect that Madeiros practiced a fraud upon IRO in obtaining the advance of $840,000, that the money so advanced and the vessel purchased with a part of it were impressed with a trust in favor of IRO by reason of the fraud, that IRO thereby became the equitable owner of the vessel, and that Republic and General were tortiously in possession thereof within the meaning of that language as used in 46 U.S.C.A. § 972 and consequently without authority to make a binding contract for repairs. There is nothing, we think, in this contention. Even if it be assumed that Madeiros was guilty of the fraud charged, and that a court of equity would on that account declare a constructive trust upon the vessel, it by no means follows that Republic's possession was tortious or that the rights of IRO could be asserted against the lien of Maryland, which was acquired in good faith and without notice of the fraud.

■ The fact that a court of equity will decree a constructive trust in property obtained by fraud or purchased with funds obtained by fraud does not mean that the title of the owner is defective or his possession tortious. A constructive trust is not a title to or lien upon property but a mere remedy to which equity resorts in granting relief against fraud; and it does not exist so as to affect the property held by a wrongdoer until it is declared by a court of equity as a means of affording relief. See Pomeroy's Equity Jurisprudence 4th ed. vol. 3, sec. 1044, pp. 2371-3; A.L.I. Restatement of Restitution sec. 160; '54 Am.Jur. pp. 169-170; Rolfe v. Gregory, 4 De Gex, J. & S. 576, 579; In re Farmers State Bank, 67 S.D. 51, 289 N.W. 75, 126 A.L.R. 619; Edwards v. Culbertson, 111 N.C. 342, 16 S.E. 233, 234, 18 L.R.A. 204. As said in the case last cited: "The trusts of which we are speaking are not what is known as 'technical trusts,' and the ground of relief in such cases is, strictly speaking, fraud, and not trust. Equity declares the trust in order that it may lay its hand upon

the thing and wrest it from the possession of the wrongdoer."

Any claim which IRO had arising out of the fraud of Madeiros was of a personal nature, not constituting a lien upon or claim against the vessel and not affecting the rights of the owner to use her for purposes of commerce or to enter into obligations with that end in view. There can be no question but that claims for repairs made under a contract with the owner would take precedence over any such equitable claim. Very much in point is the decision of this court in National Bank of Fayette County v. Enterprise Marine Dock Co., 4 Cir., 43 F.2d 547, wherein the conflict was between the maritime lien for repairs and the claim of a bank evidenced by a mortgage, which, although not executed with the formalities necessary under the statute to give it priority, certainly constituted a claim of an equitable nature of as much dignity as a claim based on fraud of the owner. The court found no difficulty, however, in sustaining the lien for repairs against such a claim. See also Morse Dry Dock & Repair Co. v. Northern Star, 271 U.S. 552, 46 S.Ct. 589, 70 L.Ed. 1082, and The Buchannon, 2 Cir., 299 F. 519.

In Dampskibsselskabet Dannebrog v. Signal Oil Co., 310 U.S. 268, 60 S.Ct. 937, 943, 84 L.Ed. 1197, the lien of one supplying oil to a vessel was sustained although the charter, while not forbidding the creation of maritime liens, provided that the charter should provide and pay for fuel. It would certainly be more reasonable to require those furnishing supplies to interpret such provisions of the charter than to require them to interpret and apply obscure equitable doctrines, such as those relating to constructive trusts, to dealings and relationships not evidenced by any writing at all. The Supreme Court, however, held that the lien for supplies might not be subjected to this hazard, saying:

"The origin of the maritime lien is the need of the ship. Piedmont & George's Creek Coal Co. v. Seaboard Fisheries Co., supra [254 U.S. 1, 11, 41 S.Ct. 1, 4, 65 L. Ed. 97]. The lien is given for supplies which are necessary to keep the ship going.

The material-man when furnishing such supplies on the order of the charterer is charged with knowledge of the terms of the charter party when he can ascertain them, but when it appears that by these terms the charterer has direction and control of the vessel and that he is the one to obtain the essential supplies, and that there is no prohibition of the creation of a maritime lien, the material-man is protected by the terms of the statute. He furnishes the supplies on the order of the person authorized to obtain them and he is entitled to rely on the credit of the vessel as well as upon the credit of the one who gives the order.

"We are of the opinion that it would thwart the purpose of the statute to compel the material-man furnishing supplies to the vessel to resolve the ambiguities which may be found in such charters as those here involved. The statute was intended to afford the material-man a reasonably certain criterion."

Whether Maryland had knowledge of the situation upon which IRO bases its claim would seem to be immaterial, in view of what we have just said; but, as a matter of fact there is nothing to indicate that Maryland had knowledge of that situation or that its lack of knowledge was due to any failure on its part to exercise reasonable diligence. It entered into the contract to repair the vessel with General, a reputable shipbuilding concern, assuming that that corporation was contracting in its own behalf. It was not advised as to the charter which Republic had signed with PCIRO; but, if it had seen that instrument, there was nothing contained therein to give notice of any fraud and no limitation upon the power of the owner to contract for repairs. Even if Maryland had learned that PCIRO had advanced the $840,000 and that Madeiros had represented that this was to be used to convert the vessel and make her ready for the service of IRO, there was nothing to indicate that the money was being diverted from that purpose. On the contrary, had Maryland known all the terms of the charter and the representations made by Madeiros, she would have been justified in assuming that

the contract made for repairs was in accord with the obligations that had been assumed by Madeiros with respect to the vessel.

IRO argues that Maryland is chargeable under 46 U.S.C.A. § 973 with knowledge of its rights as against the vessel: but the complete answer to this is that the rule of reasonable diligence prescribed by that section has application only where the dealing is with one without authority to bind the owner and has no application where, as here, the dealing is with the owner himself or with an agent whose authority is admitted. As said by the Circuit Court of Appeals of the Ninth Circuit in The Bergan, 9 Cir., 64 F.2d 877, 879: "One who furnishes supplies to a vessel upon the order of the owner thereof is not required to examine the ship's papers or to make inquiry as to the authority of the owner to bind the vessel. Such authority is given him by statute as well as by virtue of his title." Appellant seeks to give the status of owner under the statute to one who is not the owner but is merely seeking to have a constructive trust declared in equity; but there is nothing in law or in reason to support this position.

Little need be said as to the amount of the lien. There was conflict in the evidence as to whether or not the oral contract under which the repairs were made obligated the owner to pay for items, which were not embraced in the specifications discussed when the contract was made, but which were necessary to conform the vessel to the standards which the

contract provided she should meet. According to the version of the agreement given by Maryland's witnesses, this obligation rested upon the owner; and their version is borne out by the fact that General sent Shaw to be present when changes were made in the work as discussed over the telephone and to agree to them in behalf of the owner, and that he agreed to the charge to be made for items aggregating in excess of $155,000. As to the remaining items aggregating $57,910, it appears that Shaw agreed to the necessity of these and also as to the correctness of the prices charged; and, since they were not embraced in the specifications discussed in the oral contract,[1] there would seem to be no reason to treat them on any different basis from the others. The trial judge, who saw and heard the witnesses, accepted Maryland's version of the matter, and we think that his action is supported by the greater weight of the evidence. Certainly, on this record, we would not be justified in disturbing his findings with regard thereto.

We are not impressed with the arguments advanced in support of IRO's claim to a maritime lien. It is perfectly clear that the $840,000 was advanced, not to the vessel, but to the owner and upon the credit of the owner, to be repaid from charter hire. The advance was made, not only without the reservation of a lien upon the vessel, but also without restriction as to how the sum so advanced should be used or requirement that it be used in discharging liens or paying for supplies or repairs.[2] When the owner paid for supplies, for collecting a crew, etc., it discharged a liability for which it was pri-

1. An item of $8,100 relates to a C.O.2 fire extinguisher, which was discussed in the oral negotiations; but it appears that there was a mutual mistake with respect thereto and that the additional expense involved was necessary to the installation of a suitable fire extinguishing apparatus.

2. The District Judge said: "There is no reference whatsoever in the charter to any lien created on the vessel, and nothing to show that such reference was inadvertently left out. On the contrary, Madeiros, the owner, testified that there was never any intention to give IRO a lien; that IRO expected to get its money back through the charter hire as stipulated in the charter. Further, the charter says nothing about the use to which the money advanced by IRO should be put. In other words, there was no limitation placed upon its use. The Court has given full consideration to the deposition testimony to the effect that there was a very definite restriction upon its use; that there was an understanding that the restrictions existed. But the Court is not convinced by that testimony, and feels that a good deal of it has been inspired by after events." This conclusion of the District Judge is amply supported by the record.

marily responsible and no lien arose from such payment to which IRO could be subrogated. See The Aeronaut, 2 Cir., 36 F. 497. The Fort Gaines, 4 Cir., 24 F.2d 438; The Solveig, 4 Cir., 103 F. 322; Porobilo v. Taliancich, 5 Cir., 89 F.2d 341, 343; Frontera Fruit Co. v. Dowling, 5 Cir., 91 F.2d 293, 296. If liens existed in behalf of those who furnished the services and supplies for payment of which by the owner lien is claimed by IRO, it is clear that payment by the owner resulted, not in transferring such liens to IRO, but in extinguishing them; for, as said by Judge Hough in the Ruth E. Merrill, 2 Cir., 286 F. 355, 357, "it is plain that if an owner discharges a lien, he has extinguished it."

It should be noted that the case here is not one where liens against a vessel have been incurred and money is advanced to pay them off or where money is advanced for the limited purpose of procuring supplies for the vessel, but one where there is a general advance to the owner against charter hire and where the owner has used a part of the advance so made in purchasing supplies which it was his responsibility to furnish. We know of no authority which would justify holding that a maritime lien, which is strictissimi juris, arises under such circumstances; and certainly the reason underlying the maritime lien is to the contrary. See Piedmont Coal Co. v. Seaboard Fisheries Co., 254 U.S. 1, 41 S.Ct. 1, 65 L.Ed. 97.

The decree appealed from will be affirmed.

Affirmed.