## LIBEL OF PILGRIM TRUST CO. v. THE FRANCES C. DENEHY, etc.

### Adm. No. 69.

United States District Court
D. Maine, S. D.

Jan. 16, 1950.

Order Confirmed Jan. 23, 1950.

The following is the Report of Commissioner Frank M. Coffin:

### Nature of Proceeding

This is a proceeding in admiralty initiated by libellant, the Pilgrim Trust Company of Boston, Massachusetts, to foreclose a mortgage held by it on the fishing schooner, Frances C. Denehy. Libellant's claim, based on the mortgage, is disputed chiefly by an intervenor, General Foods Corporation, which claims a maritime lien superior to the mortgage for repairs made and supplies furnished subsequent to the execution of the mortgage. The claims of other intervenors, Commonwealth Ship Supply Co., Inc. and Pier Machine Company, do not affect the large issues in the case and pre-

sent no legal question which is not raised by the major intervenor.

The schooner having been sold by order of this Court on December 10, 1948, at a sale conducted by the United States Marshal for the District of Maine, for a price of $11,100.00, such fund was deposited in the Registry of the Court and is the sole source looked to in this proceeding by the parties for the satisfaction of their claims. The claims of both the libellant and major intervenor are of such a size as entirely to exhaust the fund, if either were fully recognized.

The Commissioner was appointed by the Court on December 13, 1948, to determine the rights of the parties to the fund, both as to priorities and amounts. Pre-trial memoranda were filed and hearing was had on June 27, July 5 and 6, 1949. A full transcript of testimony was prepared by the Court Reporter, upon receipt and study of which the libellant and major intervenor filed briefs, the libellant filing a reply brief on November 19, 1949.

## Nature of Claims Asserted

The libellant asserts that it loaned money in the amount of twenty-five thousand dollars to the owner of the vessel Frances C. Denehy on March 2, 1945, on the security of a first preferred ship mortgage executed on the same date. The libellant claims that each requirement of the Ship Mortgage Act[1] has been complied with, so that its mortgage is valid and entitled to priority as against the major intervenor.[2]

The intervenor contends (1) that the mortgage did not meet all the requirements of a first preferred ship mortgage under the Act, (2) that therefore its later claims for supplies, equipment, and labor should take precedence over the lien of the mortgage, and (3) that, even assuming the validity of the mortgage as a first preferred ship mortgage, intervenor has so improved the value of the vessel by its efforts that it would be inequitable to permit the libellant to recover any proceeds over the value of the vessel

at the time work was begun on it by the intervenor. The latter contention, it is urged, stems from general principles of equity which permeate the administration of admiralty law.

## The Statute—Pertinent Sections

Section 921 of the Act, 46 U.S.C.A. § 921, is as follows:

"Sale, conveyance, or mortgage of vessel of United States; record

"(a) No sale, conveyance, or mortgage which, at the time such sale, conveyance, or mortgage is made, includes a vessel of the United States, or any portion thereof, as the whole or any part of the property sold, conveyed, or mortgaged shall be valid, in respect to such vessel, against any person other than the grantor or mortgagor, his heir or devisee, and a person having actual notice thereof, until such bill of sale, conveyance, or mortgage is recorded in the office of the collector of customs of the port of documentation of such vessel, as provided in subdivision (b) of this section.

"(b) Such collector of customs shall record bills of sale, conveyances, and mortgages delivered to him, in the order of their reception, in books to be kept for that purpose and indexed to show—

"(1) The name of the vessel;

"(2) The names of the parties to the sale, conveyance, or mortgage;

"(3) The time and date of reception of the instrument;

"(4) The interest in the vessel so sold, conveyed, or mortgaged; and

"(5) The amount and date of maturity of the mortgage. June 5, 1920, c. 250, § 30, Subsec. C, 41 Stat. 1000.

Section 922, 46 U.S.C.A. § 922, is as follows:

"Preferred mortgages

"(a) A valid mortgage which at the time it is made, includes the whole of any vessel of the United States (other than a towboat, barge, scow, lighter, car float, canal boat, or

---

1. Section 30, Act of June 5, 1920, Chapter 250, Subsections A–W, 41 Stat. 1000, 46 U.S.C.A. Chapter 25, §§ 911–984.

2. Hereinafter referred to simply as the intervenor.

tank vessel, of less than two hundred gross tons), shall, in addition, have, in respect to such vessel and as of the date of the compliance with all the provisions of this subdivision, the preferred status given by the provisions of section 953 of this title, if—

"(1) The mortgage is endorsed upon the vessel's documents in accordance with the provisions of this section;

"(2) The mortgage is recorded as provided in section 921 of this title, together with the time and date when the mortgage is so endorsed;

"(3) An affidavit is filed with the record of such mortgage to the effect that the mortgage is made in good faith and without any design to hinder, delay, or defraud any existing or future creditor of the mortgagor or any lienor of the mortgaged vessel;

"(4) The mortgage does not stipulate that the mortgagee waives the preferred status thereof; and

"(5) The mortgagee is a citizen of the United States and for the purposes of this section the Reconstruction Finance Corporation shall, in addition to those designated in sections 888 and 802 of this title, be deemed a citizen of the United States.

"(b) Any mortgage which complies in respect to any vessel with the conditions enumerated in this section is hereafter in this chapter called a 'preferred mortgage' as to such vessel.

"(c) There shall be indorsed upon the documents of a vessel covered by a preferred mortgage—

"(1) The names of the mortgagor and mortgagee;

"(2) The time and date the indorsement is made;

"(3) The amount and date of maturity of the mortgage; and

"(4) Any amount required to be indorsed by the provisions of subdivision (e) or (f) of this section.

"(d) Such indorsement shall be made (1) by the collector of customs of the port of documentation of the mortgaged vessel, or (2) by the collector of customs of any port in which the vessel is found, if such collector is directed to make the indorsement by the collector of customs of the port of

documentation; and no clearance shall be issued to the vessel until such indorsement is made. The collector of customs of the port of documentation shall give such direction by wire or letter at the request of the mortgagee and upon the tender of the cost of communication of such direction. Whenever any new document is issued for the vessel, such indorsement shall be transferred to and indorsed upon the new document by the collector of customs.

"(e) A mortgage which includes property other than a vessel shall not be held a preferred mortgage unless the mortgage provides for the separate discharge of such property by the payment of a specified portion of the mortgage indebtedness. If a preferred mortgage so provides for the separate discharge, the amount of the portion of such payment shall be indorsed upon the documents of the vessel.

"(f) If a preferred mortgage includes more than one vessel and provides for the separate discharge of each vessel by the payment of a portion of the mortgage indebtedness, the amount of such portion of such payment shall be indorsed upon the documents of the vessel. In case such mortgage does not provide for the separate discharge of a vessel and the vessel is to be sold upon the order of a district court of the United States in a suit in rem in admiralty, the court shall determine the portion of the mortgage indebtedness increased by 20 per centum (1) which, in the opinion of the court, the approximate value of the vessel bears to the approximate value of all the vessels covered by the mortgage, and (2) upon the payment of which the vessel shall be discharged from the mortgage. June 5, 1920, c. 250, § 30, subsec. D, 41 Stat. 1000; June 27, 1935 c. 319, 49 Stat. 424."

Section 923, 46 U.S.C.A. § 923, is as follows:

"Certified copies of mortgage; exhibition

"The collector of customs upon the recording of a preferred mortgage shall deliver two certified copies thereof to the mortgagor who shall place, and use due diligence to retain, one copy on board the mortgaged vessel and cause such copy and the documents of the vessel to be exhibited

by the master to any person having business with the vessel, which may give rise to a maritime lien upon the vessel or to the sale, conveyance, or mortgage thereof. The master of the vessel shall, upon the request of any such person, exhibit to him the documents of the vessel and the copy of any preferred mortgage of the vessel placed on board thereof. June 5, 1920, c. 250, § 30, Subsec. E, 41 Stat. 1001."

Section 941, 46 U.S.C.A. § 941, states in part:.

"(a) If the master of the vessel willfully fails to exhibit the documents of the vessel or the copy of any preferred mortgage thereof, as required by section 923 of this title, the board of local inspectors of vessels having jurisdiction of the license of the master, may suspend or cancel such license, subject to the provisions of sections 431–434 of this title.

\* \* \* \* \* \*

"(c) If any person enters into any contract secured by, or upon the credit of, a vessel of the United States covered by a preferred mortgage, and suffers pecuniary loss by reason of the failure of the collector of customs, or any officer, employee, or agent thereof, properly to perform any duty required of the collector under the provisions of this chapter, the collector of customs shall be liable to such person for damages in the amount of such loss. If any such person is caused any such loss by reason of the failure of the mortgagor, or master of the mortgaged vessel, or any officer, employee, or agent thereof, to comply with any provision of section 923 or 924 of this title, or to file an affidavit as required by subdivision (a) of section 922 of this title, correct in each particular thereof, the mortgagor shall be liable to such person for damages in the amount of such loss. The district courts of the United States are given jurisdiction (but not to the exclusion of the courts of the several States, Territories, Districts, or possessions) of suits for the recovery of such damages, irrespective of the amount involved in the suit or the citizenship of the parties thereto. Such suit shall be begun by personal service upon the defendant within the limits of the district. Upon judgment for the plaintiff in

any such suit, the court shall include in the judgment an additional amount for costs of the action and a reasonable counsel's fee, to be fixed by the court. June 5, 1920, c. 250, § 30, Subsec. J, 41 Stat. 1003."

Findings of Subsidiary Facts

The following facts are hereby found to have been established either by stipulation or by evidence.

1. The Schooner Frances C. Denehy was a fishing vessel, being registered and enrolled under the laws of the United States of America, and having its home port at Boston, Massachusetts.

2. The Frances C. Denehy was owned by a Massachusetts corporation, Schooner Frances C. Denehy, Inc., of which one Charles M. Fauci was President.

3. The Pilgrim Trust Company, the libellant, was a corporation duly organized and existing under the laws of the Commonwealth of Massachusetts and carried on a banking business in Boston, Massachusetts.

4. General Foods Corporation, intervenor, was a corporation engaged in the processing and distribution of sea foods, with offices in New York and Boston and with a shipyard located in Rockland, Maine.

5. On March 2, 1945, the Schooner Frances C. Denehy, Inc., through Charles M. Fauci, its President, executed a promissory note in the amount of $25,000 in favor of the Pilgrim Trust Company. Payments of principal were stated to be made at the rate of $1,000 each month, with interest at 6% per annum.

As part of the transaction, a prior note and ship mortgage securing payment of the same, in the amount of $13,000, were cancelled and discharged.

6. On March 2, 1945, the Schooner Frances C. Denehy, Inc., executed and delivered to the Pilgrim Trust Company a mortgage on the Schooner Frances C. Denehy, to secure the payment of the note.

7. With respect to the mortgage the following facts are found:

a. The mortgage included and was limited to a vessel of the United States, the Frances C. Denehy. No property, not

maritime in nature, was covered by the mortgage.

b. The mortgage stated the interest of the mortgagor in the vessel and the interest so mortgaged, the name of the vessel, the names of the parties to the mortgage, the amount, and date of its maturity.

c. Four originals of the mortgage were prepared and acknowledged before a notary public authorized by the laws of the Commonwealth of Massachusetts to take acknowledgement of deeds.

8. The mortgage was recorded in the office of the Collector of Customs for the Port of Boston, the home port of the Frances C. Denehy, on March 2, 1945 at 2:45 p. m., E. S. T. in book P. M. 2, page 23.

9. The "Permanent Collateral Certificate of Enrollment and License" of the Frances C. Denehy, the ship's papers, were stamped in the office of the Collector of Customs of Boston. (Record page 51.) The following information was inserted on the ship's papers (Libellant's Exhibit #10):

"Preferred Mortgage Endorsement

(Merchant Marine Act, 1920, Sec. 30—
U.S.C. Title 46, Chapter 25.)
Mortgage Description
(Subsection DC)

Mortgagor    Schooner Frances C. (sic) Denehy, Inc.

Mortgagee    Pilgrim Trust Company Boston, Massachusetts

Endorsed    March 5, 1945, at 10 a. m.

Total amount    $25,000

Date of maturity    February 2, 1947

Discharge amount, $25,000 with interest at 6% per annum

Port of Boston, Massachusetts

(seal)

By /s/ J. M. Ayer    William H. Burke, Jr. Deputy Collector of Customs"

10. Two copies of the mortgage, together with the Certificate of Enrollment and License, were given to Mr. Fauci. Mr. Fauci then brought the Certificate of Enrollment and License to the Frances C. Denehy and gave it to the Captain. (Record, pages 51 and 56.)

Comment: Fauci's testimony was wavering as to whether he gave the Captain a copy of the mortgage. At one point (Record, page 51), he stated on direct examination that he did take a copy of the mortgage to the vessel; later, still on direct examination (Record, page 57), he stated that he did not recall about the mortgage; still later (Record, page 134), on cross-examination, he stated that he placed only the ship's papers on board, in the Captain's quarters. No other evidence appears as to whether a copy of the mortgage actually reached the vessel. It has therefore not been proven that a copy of the mortgage was on board the vessel during any time material to this proceeding.

11. After the execution of the note and mortgage, payments were made on account of principal as follows:

| March 2, 1945 | 1000, |
|---|---|
| April 2, 1945 | 1000, |
| May 2, 1945 | 1000, |
| June 2, 1945 | 1000, |
| Aug. 2, 1945 | 1000, |
| Sept. 4, 1945 | 1000, |
| Oct. 2, 1945 | 1000, |
| Nov. 2, 1945 | 1000, |
| Dec. 3, 1945 | 1000,. |
| Jan. 2, 1946 | 1000, |
| Apr. 2, 1946 | 500, |
| May 2, 1946 | 500, |
| June 4, 1946 | 500, |
| July 2, 1946 | 500, |
| Mar. 1, 1947 | 500, |
| Jan. 6, 1948 | 500, |
| Mar. 3, 1948 | 400, |
| Apr. 2, 1948 | 200,. |
| May 12, 1948 | 200, |
| July 2, 1948 | 200, |
| Total | $14000 |

12. As of December 10, 1948, when the libel was brought, the following amount was due libellant from the Schooner Frances C. Denehy, Inc.:

| On principal | $11,000.00 |
|---|---|
| On interest (6/1/48–12/10/48) | 352.00 |
| Insurance premiums paid by Libellant | 785.25 |
| Total | $12,137.25 |

13. During the period subsequent to the execution of the note and mortgage on March 2, 1945, the Frances C. Denehy was used by her owner as a fishing vessel, being operated under numerous captains. The following findings are made as to the experience and condition of the vessel between March 2, 1945 and November 1946, at which latter time the General Foods Corporation began the work of overhauling the engine of the Frances C. Denehy:

a. In the Spring of 1946 a Canadian Government vessel had occasion to tow the Frances C. Denehy into a Canadian port, for which service the Canadian Government tried to collect payment from the Schooner Frances C. Denehy, Inc.

b. In November, 1946, Louis Scola, who had previously been in charge of the Frances C. Denehy in September, 1946, and then had been replaced by another Captain, was sent to Halifax, Nova Scotia, to take charge of the vessel, which had developed some difficulty which does not precisely appear from the admissible evidence. At that time, Scola found the regular crew enjoying riotous times on shore. No substantial repairs were made to the vessel at that time and Captain Scola, with four men, brought the vessel from Halifax to Boston.

c. The Frances C. Denehy developed engine trouble in November, 1946, off Monhegan Island, on the way into the port of Rockland. The difficulty lay in starting the engine with the available supply of air. Captain Scola was able to and did start the engine, although not a licensed engineer.

d. The vessel was built in 1928.

e. Captain Scola testified that in November, 1946, "The boat was not too old, but it was in hard shape because the engine was moving around. The engine was not lined up." (Record, page 216.)

f. Fred C. Gatcombe, manager of the Rockland branch of General Foods, who superintended the repair of the Frances C. Denehy, stated that the engine beds in the vessel were loose and that the engine was moving on the beds, which movement could cause air or fuel lines to break. (Record, page 285.)

g. Mr. Ray J. Wittick, Marine Supervisor of General Foods, made a survey of the Frances C. Denehy in Boston on November 20, 1946, immediately after the trip from Halifax. He stated (Record, page 306 ff.) that some seams were not tight, a large canvas patch was nailed to one of the forward sides or wale back of the vessel, that some sheeting was missing, that some timbers and deck planks were soft, that the winch shaft bearing was worn, that some deck plates and gear were loose, that the quarters and other compartments were cluttered with debris and unclean, that the engine showed signs of oil leaks, that bolts securing the engine to the bed were loose with the apparent result that the engine had been moving on its bed, and that wiring and receptacles were loose or broken.

Mr. Wittick estimated that the vessel on November 20, 1946 was not "worth any more than two or three thousand dollars." (Record, page 309.)

h. Mr. Walter J. McInnis, a naval architect, gave an opinion as to value of the Frances C. Denehy, based on the report of physical condition made by Mr. Wittick, whose testimony is above summarized. He stated that the value in fall of 1946 of the Frances C. Denehy was "not over $5000." (Record, page 318.)

i. On December 10, 1948, the Frances C. Denehy was sold by the U. S. Marshal for $11,100.

There being no other evidence as to value, the finding is hereby made that in November 1946, the fair market value of the Frances C. Denehy was $5,000.

14. The substance of the negotiations leading up to the action of General Foods in undertaking to repair the Frances C. Denehy is in doubt. Mr. Fauci testified that General Foods made the suggestion that it be allowed to repair the vessel, whereupon it would put its own men on board and use it in fishing operations. (Record, page 106.) Mr. Gatcombe testified that Fauci asked General Foods to repair the vessel (Record, page 223), that he told Fauci that the work on the engine beds would cost about $15,000 (Record, page

226), and that this arrangement was satisfactory to Fauci.

Apart from indicating that Fauci's version appears quite improbable, no further comment need be made on this conflict of testimony, inasmuch as the rights of the parties do not, in my opinion, depend on the points at issue as just set forth.

15. The findings of fact as to the manner in which General Foods undertook and completed the work on the Frances C. Denehy are as follows:

a. Following one conference between Fauci and Gatcombe in Rockland and a second conference in Boston, the Frances C. Denehy, in charge of Captain Scola, arrived in Rockland on November 28 or 29, 1946.

b. At that time the ship's papers (Certificate of Enrollment and License) were on board, being under Captain Scola's bunk. (Record, pages 189-190.) There is no evidence that the mortgage was on board at that time.

c. Captain Scola remained in Rockland for a week or more. During this time the ship's papers were on board, being removed by Scola when he left Rockland. (Record, page 193.)

d. Captain Scola was asked at no time by anyone connected with General Foods to produce the ship's papers. (Record, page 204.)

e. Although Mr. Gatcombe testified that, shortly after the vessel's arrival in Rockland, he asked Fauci in the presence of Captain Scola whether the boat had any obligations, receiving an answer that obligations amounted to five or six hundred dollars (Record, page 224), Captain Scola, a disinterested witness, present at the time, denies that he heard anything said on the subject of obligations (Record, page 192). The finding therefore is that no such question was asked at that time.

f. Mr. Gatcombe, the boatyard manager, stated that he asked his yard superintendent to look for the ship's papers within a week of arrival. (Record, pages 237–238.) The yard superintendent reported that he could not find the papers. (Record, page 273.) Mr. Gatcombe also stated that he thought he asked the Boston office of General Foods to check the financial responsibility of the vessel's owner, receiving no reply therefrom. (Record, page 262.)

g. Not until March or April, 1947, did Mr. Gatcombe receive word of the existence of a prior mortgage on the Frances C. Denehy. Such notice was conveyed by a telephone call to Gatcombe from the Boston Operations Manager of General Foods. (Record, page 238.) At that time General Foods had spent from $8,000 to $10,000 on labor and material and had commitments with other companies for labor and parts in the sum of $2,000 to $3,000. (Record, page 248.) No attempt was made to cancel these commitments. (Record, page 248.) There was testimony that such an attempt would have met with failure.

h. The entire arrangement between Fauci and Gatcombe was on an oral basis (Record, page 270).

i. The total amount of the bill of General Foods for work and materials was $24,198.83. The charges were computed at a fair rate for the period involved and the work done was necessary to place the boat in such condition that it could be operated economically and with little danger of breakdowns caused by engine trouble.

j. After repairs were completed, General Foods supplied a captain and crew and operated the Frances C. Denehy as a fishing vessel for an undetermined period of time, it having been unsuccessful in its attempts to collect its bill for services.

Opinion on Questions of Law

Before submitting conclusions of law, it is appropriate to discuss the questions of law which have been presented in the thorough briefs of the parties.

A preliminary question as to jurisdiction must first be decided. As has been set forth, Section 922 of the Ship Mortgage Act requires that a ship mortgage, if it includes property other than a vessel, provide for the separate discharge of such property.

The intervenor argues that since the standard form of note which accompanied the mortgage provided that any monies of the Schooner Frances C. Denehy, Inc., which might be in the possession of the bank, could be held as collateral, and since the mortgage did not specify the amount of payment necessary to discharge such monies, the above requirement of the Act was not fulfilled. The intervenor draws the conclusion that therefore this court lacks jurisdiction since foreclosure might have been invoked on non-maritime property.

The Emma Giles, D.C.Md.1936, 15 F.Supp. 502, is cited as authority. While recognizing the authority of the case as applying the above section of the Act, it is necessary to say only that the *mortgage* in the instant case purports to cover only the vessel, although the *note* involves an additional undertaking. The intervenor's assumption is that the mortgage must be so read as to incorporate the terms of the note. This assumption is not well founded and is contrary to the policy of the Ship Mortgage Act. This objection, therefore, should be overruled.

### I. Compliance with Statute

The first major issue is whether the mortgage met all the requirements of the Act as set forth at the beginning of this report. I am of the opinion that the Act has been complied with, insofar as the mortgagee is concerned. As the findings of fact indicate, the mortgage was properly recorded and endorsed upon the vessel's documents.

It is true that the mortgagor may not have fulfilled the requirements of Section 923 in that it may not—so far as the evidence shows—have used diligence to place and retain a copy of the mortgage on board the vessel. Even if such were the case, the result would not be that the mortgage would therefore fail to qualify as a preferred ship mortgage. A reading of the Act reveals that Section 922 contains, either directly or by reference, all of the requirements for a valid mortgage with preferred status. Section 923, a separate section, places certain duties as to retention of a copy of the mortgage on board ship and exhibition on request, upon the mortgagor and the master of a vessel. Section 941, subsection (a) imposes a penalty of suspension or loss of license upon a master who willfully fails to exhibit the documents of a vessel or a copy of a preferred mortgage. Subsection (c) provides that the mortgagor shall be liable for damages if any person is caused loss by reason of failure of the mortgagor or master to comply with either sections 923 or 924.

To hold that, in addition to these sanctions, a later supplier or repairman in a case like that at bar would have preference over a holder of a prior recorded mortgage would be unjustifiably to read into the provisions of the Act requirements and sanctions not set forth therein. Such an interpretation would also unfairly penalize the mortgagee, who has no control over the mortgagor or the master of a vessel.

The above discussion may be unnecessary in view of the fact set forth in the findings that, as Captain Scola has testified, no one at the shipyard in Rockland ever asked him to produce the ship's papers. Had such a request been made, and the papers produced, the endorsement as to the existence of the mortgage would have been apparent.

The Bethlehem, 3 Cir., 1925, 4 F.2d 308, is not applicable to the factual situation here involved, inasmuch as the ship's papers on board the Frances C. Denehy would have shown the presence of a mortgage. In the Bethlehem, no documents on board the vessel would have disclosed the existence of a mortgage. The Court, 4 F.2d at 311, said: "Even, if during the period before or at the time the supplies were delivered and the repairs made the libellants had prosecuted an investigation and had come across the ships' papers somewhere, they would not have found endorsements of the mortgages on them, for this essential act was not performed until January 14, 1921; which was after the libellants had begun and in some instances had completed furnishing supplies and making repairs."

The Oconee, D.C., 1921, 280 F. 927, is authority for the proposition applied in this

report. In this case the Court assumed that the master of the vessel had failed to exhibit a copy of the mortgage and said, 280 F. at page 933: "The duty of having aboard the vessel a copy of the mortgage is, by the statute, specifically imposed upon the mortgagor, and the duty to exhibit it, upon the request of any person having business with the vessel, is imposed upon the master, and a penalty is provided for the failure of either to comply with the law; but it seems to be manifest that these are not conditions precedent to the acquisition by the mortgage of a preferred status."

It should be added that not only should the Branch Manager of General Foods have seen to it that the ship's master was asked to produce the papers, but, upon failing to hear from the Yard Superintendent or upon hearing from such superintendent that no papers were to be found, he should have been put upon inquiry and should have exerted greater efforts than he did in order to obtain the desired information from his Boston office. The failure of the Boston office to forward any report as to the financial condition of the Schooner Frances C. Denehy, in view of the circumstances of this case, constituted a failure to exercise reasonable care on the part of the intervenor, whether such failure can be attributed to the Rockland Branch Manager or to the Boston office or to both.

In The Favorite, D.C.S.D.N.Y.1940, 34 F.Supp. 324, Judge Conger states, 34 F. Supp. at page 328, the theory behind this burden of inquiry on the part of one dealing with a vessel: "One dealing with the ship, either in her home port or abroad, can easily ascertain whether or not there is any encumbrance on the vessel. It is his duty to so do. Should he fail, he does so at his own peril. If an inspection of the ship's papers discloses to a repairman or a contractor that there is a preferred mortgage on the ship, he deals with the ship with full knowledge, if it appears that the maturity date has passed, and no certificate of discharge is endorsed on the mortgage. He has, at least, notice that he should inquire further. He is, at least, dealing with the ship with his eyes open. See Robinson on Admiralty, 1939 pg. 452, where it is stated: 'If he feeds the mortgage elephant without inquiring, he is in the same position as if he has fed the animal knowingly. This inversion of the admiralty rule will tend to make the supplyman demand cash; and in the long run the mortgagee, as he has had to do often enough in shore mortgages, may have to feed his own elephant by paying for the supplies, etc., himself as an alternative to forcing the ship to lay up.'"

## II. Application of Equitable Principles

The intervenor has not confined its argument to its contention that the Ship Mortgage Act has not been complied with. It has pointed out the fact that admiralty law has traditionally patterned itself along equity lines, citing impressive authority. (Intervenor's Brief, pp. 13–14.) With this general proposition it is not possible to disagree.

There is no doubt that equitable principles apply to some extent and in some situations in the law of admiralty. As the intervenor points out, instances of the application of equitable principles are found in the rule of divided damages, the rule allowing compensation to a salvor, and the rule of general average.

It is urged that the equitable approach in the present case, assuming that the Ship Mortgage Act has been complied with so that the mortgagee has a preferred ship mortgage, is to recognize the validity of such lien up to but not exceeding the value of the vessel in November, 1946, when extensive repairs were initiated. The balance of the fund, argues the intervenor, should then be paid to it in recognition of the source of improvement. To allow the mortgagee to recover the entire fund, which, it is argued, has been substantially produced as a result of intervenor's repair work, would be to grant it a gratuitous windfall and to enrich it unjustly.

This is an argument commanding much respect for its ingenuity and force. Having no pertinent authority in admiralty law to rely on, counsel have skillfully invoked both

English and American cases in equity in support of their contention.

It must be admitted that a natural question arises as to the validity of such an argument, which could have been made but apparently was not made or considered by the courts in many admiralty contests in the past between creditors of differing priorities. With caution, therefore, does one approach the proposition asserted by intervenor.

The leading authority invoked by the intervenor, and that relied on by most of the other cases cited, is Bright v. Boyd, 1841, 4 Fed.Cas. p. 127, No. 1875 and, 1843, 4 Fed. Cas. p. 134, No. 1876. One Bright bought real property from an administrator. The administrator had failed to have his bond approved at the time of the sale. After Bright had made substantial improvements, a devisee, Boyd, sued Bright and recovered the property. Bright, however, was allowed, in the two cases just cited, to recover the value of the improvements.

Justice Story, who heard and reported the cases, stated in 4 Fed.Cas. at 133, No. 1875: "It appears to me * * * that the denial of all compensation to such a bona fide purchaser, in such a case, where he has manifestly added to the permanent value of an estate by his meliorations and improvements, *without the slightest suspicion of any infirmity in his own title,* is contrary to the first principles of equity." (Emphasis added.)

In 4 Fed.Cas. at page 135, No. 1876 the learned Justice states the rule of law in much the same way except that he uses the words, to describe the innocent purchaser for value, "without notice of any infirmity in his title". (See Intervenor's brief, page 17.)

It is to be noted that Justice Story was fully conscious of the novelty of the question presented to him, drawing freely and learnedly from the Roman Law commentators. It is more to the point that the doctrine was limited to one who made improvements, having no notice of a defect in his title.

It cannot be said in this case that the General Foods Corporation was without such notice, or, what is saying the same thing, without information which reasonably should have put it on inquiry, resulting in discovery of the existence of the mortgage. As has been pointed out before, the Branch Manager sent his Yard Superintendent for the ship's papers, receiving a reply that he could not find them. No inquiry was made of Captain Scola. The Branch Manager asked his Boston associates to check the financial responsibility of the owner, Boston being the home port of the vessel. No reply was received. Never having seen the ship's papers, which would have disclosed the existence of the mortgage, never having had an inquiry made at the Collector of Customs in Boston, the known home port, the Rockland branch manager of General Foods nevertheless undertook a repair job of twenty to twenty-five thousand dollars. This sequence of events constitutes a failure to exercise reasonable care in making inquiry.

Even were Bright v. Boyd, therefore, to be considered authority applicable to the rights of the parties in this case, the intervenor could not be reasonably said to be without notice of the infirmity in the title.

But there are other considerations in the nature of the case. The mortgagee claims its rights under the Ship Mortgage Act of 1920.

A discussion of the origin of the Act is found in Detroit Trust Co. v. Barlum S. S. Co., 293 U.S. 21, 55 S.Ct. 31, 36, 79 L.Ed. 176 as follows: "The Ship Mortgage Act is a part of the Merchant Marine Act 1920 (41 Stat. 988). Its declared purpose is 'to provide for the promotion and maintenance of the American merchant marine.' The Congress, in its wisdom, decided upon the means to achieve that object and set forth its conclusions in the terms of the statute. The legislative history of the statute shows the controlling considerations. The report of the Senate Committee on Commerce pointed out that 'mortgage security on ships' was 'practically worthless'; that it was proposed to 'make it good except as to

certain demands that should be superior to everything else, such as wages'; and that it was desired to have 'our people and capital interested in shipping and shipping securities.' Sen.Rep. No. 573, 66th Cong., 2d Sess. p. 9. The bill, with this purpose, was developed in conference. The managers on the part of the House of Representatives, in their statement accompanying the report of the Committee of Conference, observed that by the enlarged provisions of the bill 'the mortgagee under a mortgage upon a vessel of the United States is made more secure in his interest in the vessel than he is under existing admiralty law,' and, referring to the plan of 'creating a preferred mortgage,' added that 'the preferred status arises upon the recording of the mortgage as a preferred mortgage and its indorsement upon vessel's documents.' "

Judge Augustus N. Hand in The Favorite, when that case was heard by the Second Circuit Court of Appeals, 120 F.2d 899, at page 902, stated: "There can be no reason for supposing that ships' mortgages recorded in conformity with the Act of 1920, which was designed to make such securities desirable investments, should be subjected to limitations that would render their enforcement far more difficult and hazardous than that of similar mortgages covering land or chattels. It was plainly the purpose of the Act to make ships' mortgages as available for investment as other securities with which the public is accustomed to deal and thus to render that class of securities attractive which had been unmarketable before."

The present attempt to reduce in amount, if not to extinguish, the lien of the mortgage does not coincide with the spirit of the Act. Were the principle so ably set forth by counsel for the intervenor to prevail, the result would be that institutions lending money to ship owners on the security of mortgages could not be assured of a reasonably sound investment merely by evaluating the property at the time of the loan and then taking the necessary steps to comply with the Ship Mortgage Act. They would be forced to set up elaborate follow-up procedures in order to check on the physical condition of all ships under mortgage. The cost of maintaining such a system, adequate to keep track of vessels wherever they might be, would be substantial, if not prohibitive, even were such a system workable.

That such a burden is not placed upon ship mortgages is apparent from consideration of the purpose of the Act. The smaller and more reasonable burden of seeing the ship's papers and making inquiry at the home port is properly placed on those in the position of the intervenor.

It may be observed by way of analogy that lending institutions which extend loans on the security of ordinary real estate mortgages are not generally under the burden, once they record such mortgages, of following up the condition of the property in order to forestall well meaning materialmen from investing large sums in bettering the property.

See also the discussion in The Favorite, D.C., 34 F.Supp, 324 and 2 Cir., 120 F.2d 899, concerning the reluctance of courts to hold that a preferred ship mortgagee has waived its rights by reason of laches in following up on payments due.

The majority of the remaining authorities cited by the intervenor are deserving of some comment.

Chase v. Corcoran, 1871, 106 Mass. 286, and the American Law Institute Restatement, Section 117, both have to do with situations where one person, acting without knowledge of the owner of the property, has rendered services by way of preserving the property. In the present case, the work done on the vessel was by way of improvement. The vessel could and did operate without the substantial work on the engine done by the intervenor, although admittedly with difficulties in the operation of the engine.

Chase v. Corcoran, supra, Union Hall Association v. Morrison, 1873, 39 Md. 281, and Hatcher v. Briggs, 1876, 6 Or. 31, are cases where the person doing the work on the property either could not know of the defect in title or else took reasonable precautions to find such defect. In Thomas

v. Thomas' Executor, 1855, 16 B.Mon., Ky., 420, the court allowed a remote vendee of real property to recover for improvements made but conceded that an immediate vendee might be affected by the fact that the defect in title was of record. 55 Ky. at 425, 16 B. Mon. at 425.

■ It may be said categorically that all authorities cited by intervenor concern situations not within the admiralty jurisdiction, and in which the Ship Mortgage Act was not a factor for consideration. Both the terms of and the reasons for the Act must here be given weighty consideration. If the Act either directly or indirectly were to come into conflict with a general equitable principle, it would probably be the latter that would yield. In this case, however, even though the intervenor has expended large sums in good faith on the vessel, it cannot be said that intervenor acted without notice or reasonable grounds for notice. The intervenor has not qualified for equitable aid under the familiar maxim giving such aid to the vigilant.

A hard case may be said to be created when one of two innocent parties must be injured as the result of the irresponsibility of a third party. This is such a case. Solomonic wisdom might indicate a decree based on intervenor's argument as to betterment, the result of which would cause the parties hereto to share the loss. But such a result would, in my opinion, do violence not only to the policy and terms of the Ship Mortgage Act but also to the mercantile relations of ships, lenders, and suppliers. The risk of loss should be placed on the party who could most easily guard against it.

### Conclusions of Law

I therefore render the following conclusions of law:

1—The Pilgrim Trust Company is entitled to the preferred lien of a valid preferred ship mortgage under the Act.

2—The General Foods Corporation in undertaking improvements on the Frances C. Denehy acted without taking reasonable precautions to ascertain the existence of prior encumbrances.

3—The Commonwealth Ship Supply Co., Inc. is entitled to be paid from the fund the amount of its maritime lien incurred prior to March 2, 1945, the date of its claim being December 16, 1944, in the amount of $228.63, in accordance with a stipulation entered into by proctors of record.

4—The Pilgrim Trust Company is entitled to the remaining proceeds from the sale of the Frances C. Denehy after the lien of Commonwealth Ship Supply Co., Inc. incurred prior to March 2, 1945, as aforesaid, has been satisfied.

William B. Shevory, Boston, Mass., John E. Willey, Portland, Me., for libellant.

Alan L. Bird, Samuel W. Collins, Jr., Rockland, Me., Mark C. Candee, New York City, for General Foods Corp., intervenor.

Sidney W. Thaxter, Portland, Me., for Commonwealth Ship Supply Co., Inc. and Pier Machine Co., Inc., intervenors.

### Order Confirming Commissioner's Report

CLIFFORD, District Judge.

This action arose upon the Libel of Pilgrim Trust Company filed in this Court on November 17, 1948.

Reference of the cause was made to Frank M. Coffin, Esquire, as commissioner, to hear the evidence of the Libellant and intervenors, and to report his findings of fact and conclusions of law as to the amount due each of said parties, to determine what part of these amounts constituted liens on the Libellee vessel, and to indicate the priorities of said liens. The commissioner thereupon made his investigation, requiring such evidence as to him seemed necessary to substantiate the claims made, and submitted his report on the sixteenth day of January, A. D. 1950.

All proctors of record having been personally apprised of the contents of said report, it is

Ordered, adjudged and decreed

That the report of said Commissioner be, and hereby is, in all respects confirmed and adopted.