## THE OCONEE.

(District Court, E. D. Virginia.)

1. Admiralty ⊗—1, 15—Congress may enlarge jurisdiction; Ship Mortgage Act held constitutional.

Congress has power to enlarge the jurisdiction of the courts of admiralty by altering and amending the maritime law to embrace new causes of action, or causes not previously considered maritime, and Ship Mortgage Act June 5, 1920, § 30, providing for preferred mortgages, and conferring on courts of admiralty jurisdiction in rem to enforce the same, is within such power, and valid.

⊗—For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**2. Maritime liens ⟨⟩2—Liens on American ships asserted in American courts governed by law of forum.**

A claimant, asserting a lien in an admiralty court of the United States for supplies furnished to an American ship in a foreign port, is bound by the law of the forum.

**3. Maritime liens ⟨⟩38—Default of mortgagor held not to affect status of preferred mortgage.**

A mortgage on an American ship, which is made to conform to all the requirements of Ship Mortgage Act 1920, § 30, subsec. d (a), to give it the status of a preferred mortgage, does not lose that status by the failure of the mortgagor to keep a certified copy of the mortgage on board the ship, or of the master to exhibit it to the claimant of a subsequent lien, as required by subsection E.

In Admiralty. Suit by William H. Muller & Co., Limited, against the Steamship Oconee. On exceptions to petition of the United States, as holder of a preferred mortgage. Exceptions overruled, and decree in favor of petitioner.

Hunt, Hill & Betts, George Whitefield Betts, Jr., Morris Douw Ferris, and Joseph A. Barrett, all of New York City, Hughes, Vandeventer & Eggleston and Braden Vandeventer, all of Norfolk, Va., for Wm. H. Muller & Co., Limited.

Kirlin, Woolsey, Campbell, Hickox & Keating, James H. Herbert, and John M. Woolsey, all of New York City, and Baird, White & Lanning, of Norfolk, Va. (Edward R. Baird, Jr., and George M. Lanning, both of Norfolk, Va., of counsel), for Dartmouth Coaling Co., Limited. .

Burlingham, Veeder, Masten & Fearey, of New York City, and Hughes, Vandeventer & Eggleston, of Norfolk, Va., for Henry Kaelin & Son, Inc.

Silas B. Axtell, of New York City, and Roper, Bowden, Cochran & Sands, of Norfolk, Va., for B. A. Barack.

Baird, White & Lanning, of Norfolk, Va., for Swift & Co., Limited, and Anderson Clayton & Co.

Paul W. Kear, U. S. Atty., and H. H. Rumble, Sp. Asst. in Admiralty to U. S. Atty., both of Norfolk, Va., for the United States.

GRONER, District Judge. Libelant, on May 3, 1921, filed its libel in this court against the steamship Oconee for necessaries furnished the ship at Bremen, Germany, in February, 1921. The vessel was attached by the marshal, and, by decree subsequently entered, sold at public auction for $25,500. Numerous petitions have been filed in the cause, among them the petition of the United States, claiming, as the holder of a preferred mortgage, priority of payment out of the fund in the registry of the court. The debt thus claimed to be secured is largely in excess of the amount of the fund, and, if allowed, will leave nothing for distribution to the libelant or the other interveners.

The Oconee was originally owned by the United States. On April 26, 1920, she was sold to E. H. Green & Co. who, on July 21, 1920, with the consent of the Shipping Board, sold her to the Oconee Steamship Company. The last-named, to secure the unpaid purchase price,

executed 15 negotiable promissory notes, for $21,814.80 each, payable every 6 months, beginning October 26, 1920, and as security for these notes executed and delivered to the Shipping Board, for the account of the United States, a preferred mortgage on the whole of the vessel, which was duly recorded. Default was made in the payment of the second note, and the United States has intervened, by libel and petition in this cause, to the end that its preferred mortgage may be foreclosed, and that the indebtedness to it, evidenced by the promissory notes above mentioned, may be ascertained and paid. Exceptions, on behalf of other claimants, have been filed, in which two major questions are presented for decision:

First. "Was the enactment of the statute known as the Ship Mortgage Act of 1920, in so far as it purports to give a ship mortgage a preferred status, a valid exercise of congressional power?"

Second. "If the statute is constitutional, does the compliance therewith, which gives to a mortgage a preferred status, amount to constructive notice of the existence of the lien?"

The Ship Mortgage Act is a part of the Merchant Marine Act of June 5, 1920, 41 Stat. 1000. In order to provide an American merchant marine "sufficient to carry the greater portion of its commerce and serve as a naval or military auxiliary in the time of war," and in order to encourage investment in ships and the financing of maritime ventures, Congress, in subsection C (a) of the act mentioned, provided a method whereby a mortgage on a vessel of the United States should have a preferred status. Certain prerequisites are provided in the act to be done by the mortgagor or the mortgagee, or both, in order that the benefits of the provision may accrue—for instance: The vessel must be a vessel of the United States of 200 gross tons or upward; the mortgage must include the whole of the vessel; the mortgage must be indorsed upon the vessel's documents; it must be recorded as required, together with the time and date when the mortgage is so indorsed; an affidavit of good faith must be filed with the record; there must be no waiver therein of the preferred status, and the mortgagee must not be an alien. In the case now under consideration it is conceded that all of the requirements just named were duly complied with.

In addition to the above, certain duties are imposed by the act upon the mortgagor and master, and penalties are provided for their neglect. Thus, in section E, the mortgagor is required to retain a certified copy of the mortgage on board, "to be exhibited by the master to any person having business with the vessel which may give rise to a maritime lien," etc., and the master of the vessel is required, "upon the request of any such person," to exhibit, with the documents of the vessel, a copy of the mortgage to such person.

On behalf of the exceptants, it is now insisted that, even if the constitutionality of the act be decided affirmatively, the burden is on the United States, as claimant under the preferred mortgage, to show that the master complied with the provisions of subsection E just quoted. This proposition will be dealt with in the concluding part of the opinion.

[1] From all of the foregoing it will be seen that the question first presented for decision here is: Did Congress exceed the powers vest-

ed in it by the Constitution in passing the so-called Ship Mortgage Act (Act June 5, 1920, subsec. C; 41 Stat. p. 1000). Article 3 (section 2) of the Constitution of the United States reads as follows:

"The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;—to all Cases affecting Ambassadors, other public Ministers and Consuls;—to all Cases of Admiralty and Maritime Jurisdiction," etc.

And section 8, clause 18, of article 1, empowers Congress to make all laws necessary and proper for carrying into execution the powers vested in the government of the United States, or in any department or officer thereof. The original Judiciary Act (Act Sept. 24, 1789, § 9, 1 Stat. 76) conferred upon the federal District Courts exclusive original cognizance of all civil causes of admiralty and maritime jurisdiction, including all seizures under the laws of the impost, navigation—or trade of the United States—saving to suitors, in all cases, the right of a common-law remedy, where the common law is competent to give it.

Admittedly, Congress has no other power to legislate on the subject-matter than is thus conferred, and where the power is questioned the duty of the court is to see whether the grant is broad enough to embrace the specific act. Very early in the history of the country the jurisdiction of the District Court, in admiralty, to enforce payment of a mortgage upon a boat, was challenged, and by frequent adjudications by the Supreme Court that question was settled in the negative. In The John Jay, 17 How. 399, 15 L. Ed. 95, Judge Wayne, on behalf of the court, said:

"It has been repeatedly decided in the admiralty and common-law courts in England, that the former have no jurisdiction in questions of property between a mortgagee and the owner. No such jurisdiction has ever been exercised in the United States."

And further on in the same opinion he says:

It (a mortgage) "is a contract without any of the characteristics or attendants of a maritime loan," and, "has nothing in it analogous to those contracts which are the subjects of admiralty jurisdiction."

Likewise, in the case of The J. E. Rumbell, 148 U. S. 1, 13 Sup. Ct. 498, 37 L. Ed. 345, which was a contest between persons furnishing repairs and supplies in the home port of the vessel, on the one hand, and the holders of a mortgage, on the other, the decision gave precedence to the supply claims by virtue of a statute of the state wherein the supplies were furnished, and in the course of the opinion Mr. Justice Gray, speaking for the court, said:

"An ordinary mortgage of a vessel, whether made to secure the purchase money upon the sale thereof, or to raise money for general purposes, is not a maritime contract. A court of admiralty, therefore, has no jurisdiction of a libel to foreclose it, or to assert either title or right of possession under it."

See, also, in the same connection, The Eclipse, 135 U. S. 599, 608, 10 Sup. Ct. 873, 34 L. Ed. 269; People's Ferry Co. v. Beers, 20 How. (61 U. S.) 396, 400, 15 L. Ed. 961; The Rupert City (D. C.) 213 Fed. 263, 273.

In the light of the decisions in these cases it cannot be doubted that, unless there exists in Congress power to change the recognized and established law on the subject, the act of 1920 must be declared unconstitutional.

On behalf of the exceptants, it is insisted that Congress possesses no such power; that, when the grant of admiralty and maritime jurisdiction was surrendered by the states to the federal Government, neither more nor less was then surrendered than was understood at the time to be embraced within those terms, or, as was said by Mr. Justice Bradley, speaking for the court, in The Lottawanna, 21 Wall. 558, 574, 22 L. Ed. 654:

"The general system of maritime law which was familiar to the lawyers and statesmen of the country when the Constitution was adopted was most certainly intended and referred to when it was declared in that instrument that the judicial power of the United States shall extend 'to all cases of admiralty and maritime jurisdiction.' "

Or, as was said by Mr. Justice Catron, speaking for the court in People's Ferry Co. v. Beers, supra:

"Its terms [admiralty jurisdiction] are indefinite, and its true limits can only be ascertained by reference to what cases were cognizable in the maritime courts when the Constitution was formed—for what was meant by it then, it must mean now."

It is, therefore, argued that since the federal government may not exercise powers not granted, and since the courts have declared, quoad the grant in question, that only what was then embraced within the term "maritime" was granted, and have, likewise, decided that the thing which the statute now declares to be maritime was not then so regarded, it follows that the act should be pronounced beyond the power of Congress, just as much so as if it had declared a mortgage on a house to be maritime and enforceable in admiralty. The St. Lawrence, 1 Black, 522–527, 17 L. Ed. 180. But this position, it seems to me, finds no support either in reason or the decisions of the courts. If it be correct, this important branch of our national judicial system alone, of the entire structure, is immutable, fixed, and unalterable, responsive neither to changing conditions nor to the necessities of modern commerce, and subject to no expansion, either at the instance of state or nation. That Congress, under the grant of admiralty jurisdiction, has power and authority to alter and amend the maritime law and make substantive innovations therein cannot be doubted; for, if it were otherwise, this nation, whose coast line is more extensive and whose ocean-borne commerce is the greatest in the world, would be placed alone, of the nations of the world, in a position where legislation for the improvement, enlargement and protection of these great interests would be impossible. As was pointed out by Mr. Justice Bradley in The Lottawanna, supra, 21 Wall. 577, 22 L. Ed. 654:

"It cannot be supposed that the framers of the Constitution contemplated that the law [maritime] should forever remain unalterable."

The earlier view of the limited character of the grant has gradually, but steadily, given way to an interpretation more in harmony with modern necessities and world conditions, and the legislation in question

goes no further than to establish in this country a statute of universal application in the maritime nations of Europe. Congress, recognizing that the investment of capital in shipping was necessary if the merchant flag of the nation was to be kept afloat, and recognizing, likewise, that to obtain capital provision should be made for its protection, enacted the law giving to a ship mortgage a preferred status. In doing this it doubtless ingrafted on the American maritime law a feature it did not formerly possess. Equally beyond question, it extended its terms beyond the conception of its meaning by the statesmen and lawyers of the country when the Constitution was adopted.

But in neither respect was there anything more than a reasonable recognition of the characteristics and attendants of a maritime subject. It was not experimental, because, as has been already stated, the maritime nations of the world long ago provided by statute for a similar condition. Neither can it be said to be an unlawful assumption of power by Congress, for its right to make substantive changes in the law has been recognized since the foundation of the government, and upheld by the courts. Instances in point are: The provisions in the Judiciary Act (1789), conferring jurisdiction on the District Courts in Admiralty to seizures under the impost, navigation, and trade laws; the passage of the Limited Liability Act of 1851 (Comp. St. §§ 8020–8027); the act extending the jurisdiction in admiralty to the waters of the Great Lakes (Act Feb. 26, 1845, 5 Stat. 726, c. 20); and the act of June 23, 1910 (Comp. St. §§ 7783–7787), giving a lien against a vessel for repairs furnished in her home port. Nor is judicial recognition of this power in Congress difficult to find. Thus, in The Lottawanna, supra, Mr. Justice Bradley said:

"Congress undoubtedly has authority under the commercial power, if no other, to introduce such changes as are likely to be needed."

And in Providence S. S. Co. v. Hill Co., 109 U. S. 578, 3 Sup. Ct. 379, 617, 27 L. Ed. 1038, the same learned justice says:

"Whilst the general maritime law with slight modifications is accepted as law in this country it is subject to such amendments as Congress may see fit to adopt."

And in the case of The Scotland, 105 U. S. 24, 26 L. Ed. 1001, the court, in passing on the limited liability statute, used this significant language (105 U. S. 29, 26 L. Ed. 1001):

" * * * This particular rule of the maritime law had never been adopted in this country until it was enacted by statute."

And in the very recent case of Southern Pacific Co. v. Jensen, 244 U. S. 214, 37 Sup. Ct. 528, 61 L. Ed. 1086, L. R. A. 1918C, 451, Ann. Cas. 1917E, 900, Mr. Justice McReynolds, speaking of the power derived by Congress under the Constitution to deal with the subject, says:

"Considering our former opinions, it must now be accepted as settled doctrine that in consequence of these provisions Congress has paramount power to fix and determine the maritime law which shall prevail throughout the country."

Even in the case of The John Jay, which is relied upon to sustain the position of the exceptants that Congress has no such power, the

court seemed to recognize the power of Congress to make a ship mortgage maritime, for, after noticing the fact that it is so in England by virtue of St. 3 and 4 Vict. 65, says (17 How. 402, 15 L. Ed. 95):

"Until that shall be done in the United States, by Congress, the rule, in this particular, must continue in the admiralty courts of the United States as it has been."

Congress having now acted, the omission existing in the law as it formerly stood is supplied, and the act must be held within the power of Congress, and therefore constitutional.

[2] It is, however, further urged on behalf of the foreign supply lienors that a mortgage cannot take precedence over a lien for supplies impressed by the laws of another country, since the act cannot have extraterritorial effect. In the case at bar the vessel in question was an American vessel, and "Congress, having created * * * this species of property, and conferred upon it its chief value," may also regulate and determine "the rights * * * of all persons dealing therein." White's Bank v. Smith, 7 Wall. 656, 19 L. Ed. 211. Under the English maritime law, neither of the foreign petitioners would have been entitled to a lien, and while under the maritime laws of the United States they would have been so entitled, Congress has, by the act in question, made such lien subordinate to that of the preferred mortgage, and petitioners seeking relief in an American court are bound by the law of the forum. The Scotland, 105 U. S. at pages 31, 32, 26 L. Ed. 1001.

[3] It is also insisted· that in the instant case the petition of the United States is insufficient, in that it does not allege compliance with the Ship Mortgage Act; the point being that it is not shown by the petition that the master of the Oconee exhibited to the libelant a copy of the preferred mortgage or otherwise called attention to the existence of the same; that the language of subsection E, "cause such copy, and the documents of the vessel, to be exhibited by the master to any person having business with the vessel," etc., when given proper effect, imposes upon the mortgagee the duty and obligation of seeing that the master notifies every person furnishing supplies to a vessel, in a foreign port, of the existence of the mortgage, in order that such persons may act with open eyes.

An examination of the petition of the United States shows that it is there alleged that compliance in detail with the requirements of the statute was duly had. It is true it is not alleged that libelant, or the other intervening supply petitioners, had actual notice of the mortgage, nor is it specifically alleged that the master of the vessel exhibited a copy of the same to such persons; but, conceding the master failed in this respect, and that petitioners were without actual notice, the question is: To what extent, if any, does this affect the claim of the mortgagee? The duty of having aboard the vessel a copy of the mortgage is, by the statute, specifically imposed upon the mortgagor, and the duty to exhibit it, upon the request of any person having business with the vessel, is imposed upon the master, and a penalty is provided for the failure of either to comply with the law; but it seems to be manifest

that these are not conditions precedent to the acquisition by the mortgage of a preferred status.

By the terms of the act a preferred status attaches as of the date of compliance with subdivision (a) of subsection D. The compliance with these provisions, as· has been heretofore stated, is admitted, and the statute itself nowhere seems to contemplate any default on the part of the mortgagee for the failure of compliance with those sections of the act to be performed by the mortgagor and the master. The mortgagor (the owner) is subjected to a penalty if he fails to deliver on board the ship a copy of the mortgage. The master is likewise subject to a penalty if he fails to exhibit the same when called upon. The mortgagee, in the nature of things, has no control over either, and the act clearly does not contemplate the invalidity of the mortgage by reason of such failure on their part. It might have been more completely in the interest of fair dealing if provision had been made for the posting of copies of the mortgage in prominent parts of the vessel; but to a person dealing on the credit of the vessel, with knowledge of the statute, the provisions as they are afford ample protection, because by a simple inquiry of the master such person may ascertain and verify the title condition.

What would be the effect of a willful misrepresentation on the part of the master under such circumstances is not involved in this case, and need not be answered. But that Congress had the power to provide, as it has, for the creation of the lien, and make compliance with the conditions prescribed, constructive notice, seems to me to be beyond question. Indeed, it was so held by the Supreme Court in the case of an act (Act July 29, 1850 [Comp. St. § 7778]) giving a mortgagee precedence over a subsequent mortgagee or purchaser. White's Bank v. Smith, supra. And it would therefore seem to be clear that all persons, whose dealings with a vessel may give rise to claims which are by statute made subordinate to the mortgage, are, when the provisions precedent of the mortgage are complied with, affected with constructive notice and bound by its terms.

A decree will be entered, on presentation, overruling the exceptions to the libel and petition of the United States, and the claims of the United States will be held superior to all claims against the vessel other than preferred maritime liens, as defined by the statute under consideration, if any such shall be established.