## THE FAVORITE.

## THE HOOK MOUNTAIN.

## THE BEAR MOUNTAIN.

CORN EXCHANGE BANK TRUST CO. v. McALLISTER NAV. CO., Inc. (TIETJEN & LANG DRY DOCK CO., et al., Interveners).

District Court, S. D. New York.
May 17, 1940.

Laughlin, Gerard, Bowers & Halpin, of New York City (Bigham, Englar, Jones & Houston, of New York City, of counsel; George S. Brengle and John L. Quinlan, both of New York City, Advocates), for libelant.

Crowell & Rouse, of New York City (E. Curtis Rouse and George L. Varian, both of New York City, of counsel) for intervenors.

CONGER, District ·Judge.

The libel herein is brought by the Corn Exchange Bank Trust Company to foreclose a preferred mortgage on three vessels, the SS Bear Mountain, SS Hook Mountain, and SS Favorite. The facts have been stipulated or admitted in the pleadings, except that proof was given in Court of service of notice of actual commencement of the suit as required by statute and by order of this Court entered herein. No appearances or claim of the owner were filed on behalf of any of the three vessels, nor was any appearance or answer filed by or on behalf of McAllister Navigation Co. Inc., which was joined herein as a party respondent, and all are in default.

Each of the three vessels has been heretofore sold by the United States Marshal under order of this Court on the ground that the vessels were perishable property.

The SS Bear Mountain was sold for $50,000, of which $37,500 was paid by the execution by the purchaser of a new preferred mortgage in favor of the Palisades Interstate Park Commission in discharge of a prior preferred mortgage which that institution held on the vessel. The balance of the purchase price, $12,500, less expenses of the clerk, marshal, etc., is now in the registry of this court.

In this case (SS Bear Mountain), Tietjen & Lang Dry Dock Co. intervened, filed an answer admitting the factual allegations of the libel, but alleged that its

lien for repairs and supplies furnished to the vessel, in the sum of $27,162.25, is superior to the preferred mortgage lien of the Bank. The Bank stipulated that Carl F. Bogelman held a supplyman's lien against the SS Bear Mountain for $410.49, and is in the same position as Tietjen & Lang Dry Dock Co.

The SS Hook Mountain was sold for $11,000 and that sum less expenses of the clerk, marshal, etc. is now in the registry of this court. Carl F. Bogelman, it is stipulated, also has a lien on this ship for $98.36, and claims that this should be paid him on the ground that his lien is now superior to the preferred mortgage of the Bank. There is also a claim for $320 by one Paradine which is treated in a separate opinion.

The SS Favorite was sold for $505, which is in the registry of this court. The only claimant to this sum, other than the Bank, is one Collyer, which claim is treated in a separate opinion.

On December 24, 1929, McAllister Navigation Co., Inc., executed a bond in the principal sum of $100,000 in favor of the Corn Exchange Bank Trust Company. Simultaneous with the execution and delivery of the bond, the corporation, sole owner of the vessels, executed a preferred mortgage in favor of the bank, in the principal sum of $100,000 the maturity date of the mortgage being April 1, 1930. The preferred mortgage was duly and properly recorded in the office of the Collector of Customs, Custom House, New York City (the home port of the vessels) and was endorsed on the documents of the three vessels.

The mortgage provided that the SS Bear Mountain might be discharged from the lien thereof upon payment to the mortgagee of the sum of $80,000 with interests thereon accrued; the SS Hook Mountain upon payment of $9,000, with interest; and the SS Favorite upon payment of $11,000, with interest.

The mortgage stated that it was subject and subordinate to a preferred mortgage in the sum of $44,000, on the SS Hook Mountain, which was thereafter paid and satisfied, although never discharged of record in the Custom House. It also stated that it was subject to a preferred mortgage in the sum of $175,000, on the SS Bear Mountain, which was reduced to $37,500, and which was paid off

and discharged out of the proceeds of the sale of that ship.

The preferred mortgage in suit was not paid at maturity on April 1, 1930. However, the mortgagor from time to time paid interest falling due, and various sums on account of principal. The last of such payments was made on May 8, 1939. The principal sum outstanding now is $78,622.03.

The libels were filed in the spring of 1939 when it became apparent that the McAllister Navigation Co., Inc., was hopelessly insolvent.

It is stipulated that at the time of its endorsement on the ship's papers (December 26, 1929) the Bank's mortgage was a preferred mortgage and complied with the Ship Mortgage Act, 46 U.S.C.A. § 911 et seq. The intervenors, who hold ordinary supplymen's and repairmen's liens, do not contend that the Bank waived the lien which it admittedly had as a preferred mortgage, but they do claim that, as to them, the Bank lost the preferred status of its lien, so that on distribution of the funds in the registry of this court, their liens outrank that of the Bank, and should be paid first.

The intervenors have two contentions here: first, that the preferred status given by the Ship Mortgage Act ceased on the maturity date of the mortgage; and, second, that the preferred status of the mortgage has been lost either by waiver or laches or both.

I cannot hold with the intervenors in either of these contentions. If their contention is maintained, they would have priority over and ahead of this mortgage with its preferred status, and were I to hold with them, I would be writing into the Act something not now there. The Act contains no period of limitation within which an action of this kind must be commenced, and no provision of putting a time limit on the preferred status of the mortgage. It contains no provisions for the extension of the mortgage lien and/or the preferred status, after the maturity date of the mortgage.

From the Act itself, and from the motives which induced the Congress to place on the statute books this Ship Mortgage Act of 1920, one can draw only the conclusion that the lien of the mortgage on the ship, and also if it happened to be a preferred mortgage, that the preferred

status thereof remains as long as the mortgage is unpaid, unless lost by reason of the provisions of the Act itself.

The United States Supreme Court, in the case of Detroit Trust Company v. Barlum S.S.Co., 293 U.S. 21, 55 S.Ct. 31, 79 L.Ed. 176, in construing the Act, considered the nature thereof, its preference and reasons for its being. The Court said, at page 38, 39 of 293 U.S., at page 36 of 55 S.Ct., 79 L.Ed. 176:

"The Ship Mortgage Act is a part of the Merchant Marine Act 1920 (41 Stat. 988). Its declared purpose is 'to provide for the promotion and maintenance of the American merchant marine.' The Congress, in its wisdom, decided upon the means to achieve that object and set forth its conclusions in the terms of the statute. The legislative history of the statute shows the controlling considerations. The report of the Senate Committee on Commerce pointed out that 'mortgage security on ships' was 'practically worthless'; that it was proposed to 'make it good except as to certain demands that should be superior to everything else, such as wages'; and that it was desired to have 'our people and capital interested in shipping and shipping securities.' Sen.Rep. No. 573, 66th Cong., 2d Sess., p. 9. The bill, with this purpose, was developed in conference. The managers on the part of the House of Representatives, in their statement accompanying the report of the Committee of Conference, observed that by the enlarged provisions of the bill 'the mortgagee under a mortgage upon a vessel of the United States is made more secure in his interest in the vessel than he is under existing admiralty law,' and, referring to the plan of 'creating a preferred mortgage,' added that 'the preferred status arises upon the recording of the mortgage as a preferred mortgage and its indorsement upon vessel's documents.' * *

"In placing ship mortgages upon a stronger basis as securities, the Congress had in mind, and expressly included, trust deeds securing issues of bonds to the public. Subsection B, 46 U.S.C. § 911 (46 U.S.C.A. § 911). * * *

"We cannot fail to regard the encouragement of investments 'in shipping and shipping securities'—the objective of the Ship Mortgage Act—as an essential prerogative of the Congress * * . *".

■ Had Congress intended that the preferred mortgage would lose its preferred status on the maturity date, it would undoubtedly have said so. To hold that the preferred mortgage loses its preferred status when the mortgage matures and that after that it is only a mortgage lien subject to priorities now disallowed under the Act, would defeat the very purpose of the Act.

Admiralty Courts have, for a long time, applied the rule on bottomry bonds, which was the only means an investor had to protect his investment. The bottomry bond was of a restricted character, and was the result of a loan "in which a sum of money was loaned for a particular voyage, * * . * on the security of the ship, or the ship and freight, or the ship, freight and cargo, * * * on condition that if the voyage be performed safely, the loan shall be repaid with the interest, and if she did not so arrive, but is lost by a peril of the sea, nothing shall be paid." Benedict on Admiralty, 5 Ed., Vol. 1, pg. 173.

Payment was to be made at the end of the voyage or a short time thereafter or the lien was lost. If a ship perished before the voyage was over, the lender lost his right to recover any of his investment.

■ Therefore, when the Congress, for the purpose of creating a merchant marine, passed the Merchant Marine Act, they added to it the Ship Mortgage Act. This was done to attract investors to loan money on a ship, to liberalize the old rules governing bottomry bonds and maritime liens. As one author has very well put this: "The Ship Mortgage section recognizes that if the United States was to have a merchant marine other than at public cost, the money lending interests had to be attracted by more bait. The net result of the legislation was to step up the common law mortgage, give it maritime character and assign it a place of preference even among the maritime securities." Robinson on Admiralty, 1939, pg. 442.

■ As to waiver of the right to a preferred status under a mortgage, or a loss thereof by laches, one should look only to the Act itself, and not outside it. The provisions of the Act on this point are set forth in Section 974 of Title 46 U.S.C., 46 U.S.C.A. § 974. The applicable parts read as follows: "Nothing in this chapter shall be construed to prevent * * * the mortgagee, from waiving his right to

a lien, or in the case of a preferred mortgage lien, to the preferred status of such lien, at any time, by agreement or otherwise `* * *`."

There is no contention on the part of the intervenors that the preferred status of this mortgage was lost by agreement. Under the above section then, if the preferred status was to be lost pursuant to the Act, it must be, in this case, not because of an agreement, but by reason of the words therein contained "or otherwise".

Therefore these words "or otherwise" must be considered. I am satisfied that they do not mean waiver by delay in foreclosing.

If the lien of the mortgage, and also the preferred status, lasts as long as the mortgage is alive and unpaid, then delay in foreclosing is of no consequence. It would seem that the Act and the provisions thereof regarding ship mortgages and preferred status of a preferred mortgage can have no other construction.

The provisions of the Act go into great detail as to how these mortgages should be set up and what they should contain. They provide for priorities, between certain specific liens and the preferred status of the mortgage. They further provide that the mortgages should be recorded in the office of the Collector of Customs of the port of documentation of the vessel, and in the case of a preferred mortgage (Section 922) they require many more details to be carried out before the mortgage acquires a preferred status. They further provide that it is to be the duty of the mortgagor to keep a certified copy of the mortgage on board the vessel, and to cause it and the documents of the vessel to be exhibited by the master to any person having business with the vessel which might give rise to a maritime lien (Section 923); and further provide that the master for failure to exhibit the ship's documents or the copy of any preferred mortgage be subject to a penalty (Section 941).

These last provisions with respect to the recording, etc., are intended as notice to the whole world. One dealing with the ship, either in her home port or abroad, can easily ascertain whether or not there is any encumbrance on the vessel. It is his duty to so do. Should he fail, he does so at his own peril. If an inspection of the ship's papers discloses to a repairman or a contractor that there is a preferred mortgage on the ship, he deals with the ship with full knowledge, if it appears that the maturity date has passed, and no certificate of discharge is endorsed on the mortgage. He has, at least, notice that he should inquire further. He is, at least, dealing with the ship with his eyes open. See Robinson on Admiralty, 1939 pg. 452, where it is stated: "If he feeds the mortgage elephant without inquiring, he is in the same position as if he has fed the animal knowingly. This inversion of the admiralty rule will tend to make the supplyman demand cash; and in the long run the mortgagee, as he has had to do often enough in shore mortgages, may have to feed his own elephant by paying for the supplies, etc., himself as an alternative to forcing the ship to lay up."

The intervenors have called my attention to the rule in admiralty so long applicable to bottomry bonds, respondentia bonds, and other maritime liens, and point out that they must be enforced or foreclosed promptly or within a reasonable time or else they lose their priority. I do not think that these rules apply here. Those liens are of a secret nature, and by reason thereof should be enforced promptly. They should not be allowed to grow stale to the disadvantage of new materialmen and supplymen. Failure to enforce these liens promptly would lead to abuses and evils, with no advantage to the ship. It would be hard to get anyone to trust the ship, if the rule was such that he might be deprived of his compensation by secret, silent and stale liens.

I do not regard the rule regarding chattel mortgages and conditional bills of sale as of any weight herein. There the statute specifically states that the chattel mortgage, for instance, is invalid after one year, as to subsequent creditors in good faith. This is a statutory enactment. The lien of the chattel mortgage, however, may be kept alive according to the statute, by a proper refiling year after year. No such statutory enactment is contained in the Ship Mortgage Act.

The question involved herein has not been raised many times, as far as I can find. There is, however, some precedent for my holding. See The Red Lion, D.C., 22 F.2d 329. In that case, where practically the same question was pre-

sented, the Court stated that the preferred mortgage on a ship would not lose its preferred status by laches. There is also the case of The Portchester, 2 Cir., 56 F.2d 579. That case is not exactly in point, but the principle enunciated therein can be applied here.

A decree should be entered herein in favor of libelant, foreclosing the preferred mortgage held by it on each of the three vessels; directing that the lien of the said preferred mortgage is superior to that of the intervenors; further directing that all sums now in the registry of this court, from the sale of said vessels be paid over to libelant; further directing that the petition of Tietjen & Lang Dry Dock Company, and the petitions of Carl F. Bogelman be dismissed; and further directing that McAllister Navigation Co., Inc., as mortgagor, pay to the libelant the deficiency, that is, the difference between the amount so paid out of the registry of this court to the libelant and the amount due and owing as principal and interest under said preferred mortgage.

If this opinion is not in sufficient compliance with the rule requiring findings of fact and conclusions of law, submit, on notice, findings of fact and conclusions of law in accordance therewith.