**ATLANTIC STEAMER SUPPLY COM-
PANY, Inc., a District of Columbia
Corporation,**

v.

**THE SS TRADEWIND,** her engines,
boilers, etc.

No. 3799.

United States District Court
D. Maryland.

June 11, 1957.

Norwood B. Orrick, of Baltimore, Md., and John Geyer Tausig, of Washington, D. C., for W. Henry Smith Agencies, Inc.

Ober, Williams, Grimes & Stinson, Baltimore, Md. (William A. Grimes), of Baltimore, Md., for Alaska Steamship Co.

Solomon B. Levin, of Baltimore, Md., for Larrabee Associates.

R. DORSEY WATKINS, District Judge.

This is a continuation of a proceeding in admiralty in rem to determine the proper distribution of the proceeds from the sale of the Steamship Tradewind, a foreign documented vessel. The case is now before the court on (1) the motion of W. Harry Smith Agencies, Inc., a foreign supplier, for leave to amend its intervening libel and for reconsideration of this court's opinion of August 7, 1956,[1] insofar as that decision held that "the liens of the foreign suppliers [are] subordinated to the lien of the preferred mortgage",[2] together with the answer and exceptions of the Alaska Steamship Company, mortgagee,[3] to such amended libel; and on (2) the exceptions of the Alaska Steamship Company to the intervening libel of Larrabee Associates, a partnership engaged in the advertising business with its principal place of business in Washington, D. C., claiming a maritime lien.

### Claim of The W. Harry Smith Agencies, Inc.

The W. Harry Smith Agencies, Inc., (Smith) was engaged by the Caribbean Atlantic Steamship Company, the owner and mortgagor of The Tradewind, as a special agent to furnish port, cargo, passenger, ship and sundry facilities to and on behalf of the vessel in the port of Havana, Cuba, and such services were rendered the ship on three voyages she made to the port of Havana between July 31, 1955, and October 1, 1955. On November 9, 1955, the Caribbean Atlantic

---

1. Atlantic Steamer Supply Co. v. The Tradewind, D.C.Md.1956, 144 F.Supp. 408.

2. 144 F.Supp. at page 421.

3. The right of all interested parties to require the mortgagee to prove, in subsequent proceedings, compliance with the formal conditions precedent to the validity of the mortgage has been expressly reserved. 144 F.Supp. at page 410, footnote 1.

Steamship Company filed a voluntary petition in bankruptcy scheduling liabilities of $587,000 and assets of $385,000 including The Tradewind listed as valued at $332,000 but which later sold for $222,000.

On the basis of these facts[4] and relying on section 953 of Title 46 U.S.C.A. which defines a preferred maritime lien[5] and accords it priority over the preferred mortgage lien, Smith seeks to build its maritime lien as a supplier into a preferred maritime lien for damages arising out of tort by amending its intervening libel to allege that "on all of the aforementioned dates the *officers* of the Caribbean Atlantic Steamship Company, Inc. [sic], *knew* of that company's insolvency and the financial inability of the SS Tradewind to pay for the aforementioned port, cargo, passenger, ship and sundry facilities, services and materials furnished by The W. Harry Smith Agencies, Inc., to and for the benefit of the S.S. Tradewind *and, therefore in effect accepted payments* for the same *fraudulently.*" (Emphasis supplied). By answer and exceptions the mortgagee, Alaska Steamship Company (Alaska) stated no objection to the making of the requested amendment but reserved the right to contend that the failure to claim a preferred maritime lien in the original intervening libel of Smith indicated, in and of itself, a lack of merit in the intervening libel, as amended, and that as a matter of law no preferred maritime lien arose out of the facts set forth in the amended intervening libel. The amendment was allowed in open court.

As authority for its contention in its amended libel, Smith cites an opinion of this court by Judge Soper, then a district judge, in which the liens claimed by certain shippers for damages occasioned by the complete failure of the vessel to sail were based on the fraudulent[6] conduct of the ship in accepting prepayment of freight for cargo actually placed on board at a time when the vessel's corporate owner was insolvent and the ship was clearly unable to perform the services which she held herself out to the community as being capable of rendering. The court in that case, The Henry W. Breyer, D.C.Md.1927, 17 F.2d 423, 431, said:

"On another ground, the shippers were justified in alleging that they were damaged *by acts of the vessel* which amounted to torts. The complete financial inability of the owner of the vessel to comply with the obligations of a common carrier is so clearly shown by the testimony that it must have been known to the managers of the vessel when the cargo was taken on board. The action, therefore, in accepting the goods, and particularly in receiving the freight money in advance, from the intervening libelants, was in effect fraudulent. The navigation corporation was doubtless insolvent, and the situation was analogous to that which has been frequently before the courts in reclamation proceedings in bankruptcy. It is a general principle that, when a person who is insolvent purchases goods with no intention of paying for them, *and conceals his insolvency* and his intention not to pay, he is guilty of fraud which entitles the vendor to recover the goods. Knowledge of inability to pay when the purchase is made is equivalent to purchase with intent not to pay. Such purpose is constructively fraudulent. In re Henry Siegel Co., (D.C.) 223 F. 369; Gillespie v. Piles & Co., (C.C.A.) 178 F. 886 [44 L.R.A.,N.S.,

---

4. All properly pleaded allegations of fact, must, for the purposes of a hearing on exceptions, be taken as true.

5. Section 953. "(a) When used hereinafter in this chapter, the term 'preferred maritime lien' means * * * (2) a lien for damages arising out of tort, * *."

6. Before considering the question of fraud, the court had first found the ship guilty of negligence entitling the shippers to preferred maritime liens for damages arising out of tort but this part of the decision is not relevant to the issues raised in the instant proceeding.

1] ; Hornor v. Henning, 93 U.S. 228, 23 L.Ed. 879 ; In re K. Marks & Co., (C.C.A.) 218 F. 453 ; Jones v. H. M. Hobbie Grocery Co. (C.C.A.) 246 F. 431 ; In re Liebig (C.C.A.) 255 F. 458 ; In re Stewart (D.C.) 178 F. 463 ; In re Kenyon (D.C.) 156 F. 863. *It was equally fraudulent for the ship to accept payment for services which she was clearly unable to perform."* (Emphasis supplied).

■■■ It at once becomes apparent by a comparison of the underlined portions of Smith's amended intervening libel with the underlined portions of the opinion in The Henry W. Breyer that the former is, at the most, nothing more than an allegation of personal fraud on the part of the officers of the corporate shipowner, while the latter clearly makes the well established distinction in admiralty between the shipowner and the ship. Where the fraud of the owner is of a personal nature, a claim for damages arising out of that fraud does not constitute a lien upon, or a claim against, the vessel. International Refugee Organization v. Maryland Drydock Co., 4 Cir., 1950, 179 F.2d 284, 288. Judge Chesnut in Todd Shipyards Corporation v. City of Athens,[7] D.C.Md.1949, 83 F.Supp. 67, 76, considering the import of the decision in The Henry W. Breyer as being "only a recognition of a long existing right of a claimant to sue in tort for damages resulting from wrongful action of a common carrier with respect to passengers or cargo after they had physically come within the control· of the carrier", refused to hold a ship liable in tort [8] for breach of an executory contract for the transportation of passengers who had not come within the care or control of the carrier; finding the obligation to transport that of the owner, not of the vessel. "The maritime lien is of very ancient lineage. Its conceptual origin lies in the personification of the ship itself. The ship as an entity, considered apart from the personal liability of the owner, becomes responsible for benefits conferred and damages committed by her." Todd Shipyards Corporation v. The City of Athens, supra, 83 F.Supp. at page 74. There is no question in the instant case, and this court has so held,[9] that The Tradewind is personally responsible for the benefits she derived from Smith under the provisions of section 971, Title 46 U.S.C.A. giving a maritime lien to one furnishing necessaries to a vessel upon the order of the owner, the only question being one involving priorities—whether or not The Tradewind was guilty of fraudulent conduct toward Smith giving rise to a preferred maritime lien. The intervening libel, as amended, alleges no fraud on the part of the vessel.

7. Filed with the report of the Senate Committee on Interstate and Foreign Commerce is a letter from the Deputy Attorney General of the United States, herein quoted in part, explaining the views of the Department of Justice on the then pending 1954 amendment to the Ship Mortgage Act, 1920 and citing both the Fourth Circuit's opinion in the International Refugee Organization case (The San Francisco) and the District Court's opinion in The City of Athens.

"It might be well to make it clear that this bill will merely provide a forum on the admiralty side for litigation as to ship mortgages; that it does not give foreign ship mortgages the same order of priority over repair and other liens which is now given to preferred ship mortgages on United States-flag vessels; and that in the adjustment of priorities the admiralty court is to follow the es-tablished admiralty rules relative to general priorities between maritime liens on foreign vessels which are sold by the court. The admiralty courts of this country have well-established rules respecting the relative priorities in cases where foreign ships are sold by the courts of this country. (See The City of Athens, 83 F.Supp. 67 (D.Md., 1949) ; The San Francisco, 179 F.2d 284 (C.A. 4th, 1950) )." (S. Rep. 1213, 83d Cong., 2d Sess. pp. 3–4).

8. Judge Chesnut's opinion was in effect affirmed in Acker v. The City of Athens, 4 Cir., 1949, 177 F.2d 961, when a petition to stay, without bond, the distribution of the fund pending the determination of an appeal of the district court's decision, was denied upon the merits.

9. See footnote 1, supra.

■ Assuming for the moment that the intervening libel were more aptly amended to state an acceptance *by the ship* of services and necessaries for which she knew at the time of acceptance that she could not pay, the supplier's position would still be untenable and again The Henry W. Breyer indicates what other element must be alleged—concealment of insolvency. The facts in the instant case alone must, of necessity, bar the supplier from asserting fraudulent concealment on the part of the ship. The Tradewind was subject to a preferred mortgage executed on December 27, 1954, in the principal sum of $200,000. At the time of the mortgagor's default on October 15, 1955 the principal sum of $136,000 still remained owing. The mortgage clearly recited that neither the shipowner nor the master had the authority to incur any liens against the vessel other than for crew's wages or salvage. A framed notice six inches wide by nine inches high was required under the terms of the mortgage to be kept in a prominent place in the chartroom and in the master's cabin advising of the mortgage prohibition against the creation of liens upon the vessel. The preferred mortgage was endorsed upon the documents of The Tradewind, a copy was placed on board, and the documents and the copy were exhibited by the master to all persons having business with the vessel which might give rise to a maritime lien.[10] The vessel clearly gave notice, the solvency or insolvency of her corporate owner being irrelevant as to the vessel's representation of her own ability to pay for services rendered, that her own credit was pledged first to the payment of the preferred mortgage.

■■ In addition to the complete absence of any factual support for an allegation of fraudulent concealment, the legal effect, as regards concealment, of a clause in a valid preferred mortgage prohibiting the creation of any liens whatsoever other than for crew's wages or salvage, must be considered. The purpose of the Ship Mortgage Act, 1920, 46 U.S. C.A. § 911 et seq., was to make ships' mortgages desirable investments. To effectuate this purpose it is necessary to charge suppliers with notice of a valid preferred mortgage.

"One who furnishes supplies to a vessel upon the order of the owner thereof is not required to examine the ship's papers or to make inquiry as to the authority of the owner to bind the vessel. Such authority is given him by statute as well as by virtue of his title. *To be sure, one who furnishes supplies, etc., to the owner of a vessel is chargeable with notice of a valid preferred mortgage thereon;* * * * ." The Bergen, 9 Cir., 1933, 64 F.2d 877, 879; accord: Morse Drydock & Repair Co. v. The Northern Star, 1926, 271 U.S. 552, 554, 46 S.Ct. 589, 70 L.Ed. 1082; Atlantic Steamer Supply Co. v. The Tradewind, D.C.Md., 1956, 144 F. Supp. 408, 414.

Courts dealing with mortgages on vessels of the United States have held that the preferred mortgage lien takes precedence over the supplier's lien even where no notices relative to the mortgage have been posted on the vessel and the mortgagor has failed to use diligence in placing a copy of the mortgage on board the ship and causing it to be exhibited to all having business with the vessel which might give rise to a maritime lien, the rationale of such cases being that compliance with the provisions of section 922 of Title 46 U.S.C.A., requiring among other things that the mortgaged vessel be a vessel of the United States of 200 gross tons or more, endorsement of the mortgage upon the vessel's documents,

---

10. These facts appear in the record of the case; in part, as allegations in the mortgagee's intervening libel; in part, as shown on the face of a photostatic copy of the mortgage attached to said intervening libel as exhibit B; and are summarized as to their effect in the Trustee's answer to Smith's original intervening libel, as constituting actual or constructive knowledge by the supplier of the prohibitory clause of the mortgage, which answer was adopted by the mortgagee in the earlier proceeding as reflecting its position.

recordation, an affidavit of good faith, and no waiver of the mortgagee's preferred status, suffices to protect the mortgagee by putting the burden of inquiry on the supplier, such inquiry being directed not to the owner's authority to create a maritime lien for supplies but rather to the priority accorded the lien so created. The Oconee, D.C.Va.1922, 280 F. 927, 929, 933–934; Libel of Pilgrim Trust Co. v. Frances C. Denehy, D.C.Me.1950, 94 F.Supp. 807.

That this is not an unreasonable burden and is, in fact, a necessary precaution regularly taken by American suppliers of American documented vessels to insure their security therein and that even suppliers of a foreign documented vessel may without difficulty determine whether or not prior liens exist is evidenced by testimony before the Committee on Merchant Marine and Fisheries of the House of Representatives when the 1954 amendment to the Ship Mortgage Act, 1920, was being considered.[11] Congress saw fit in the 1954 amendment, 46 U.S.C.A. § 951, to accord the liens of American suppliers of foreign documented vessels priority over the lien of the preferred mortgage thereon but denied such priority to the liens of foreign suppliers,[12] both American and foreign suppliers remaining chargeable with notice of a valid preferred

11. Mr. Arnold Knauth representing the American Bar Association's Committee on Admiralty and Maritime Law commented as follows:

"Now, what this little rider says is that the American repairman is safe in repairing a foreign ship without getting a direct confirmation from her foreign home port that there is, or is not, a mortgage on her. He will come ahead of the mortgage even if he does not have the time or the facilities to find out about the mortgage. For an American ship *he must find out about the mortgage.* There is no trouble in sending a message to any United States customs house and finding out in 5 minutes whether there is a mortgage or not. We all understand there would be great tangles in sending a similar message to Guatemala, where they might send back word and say, 'We are awfully sorry, the customs house here temporarily is in a turmoil and nobody is working.' Meanwhile, the ship is sinking. She needs to be repaired. She needs to be pumped. She has come in under damages. Something has to be done. It is silly to let values deteriorate because you cannot get messages to these foreign places. That is the purpose of the rider.

"It seems to us a very sensible, practical and useful thing and it is proper and protects our American shipyards and our American repair yards, and they are entitled to that protection.

"I may say this to Mr. Mumma. It is a practical proposition. I suppose that there are 100 million houses in the United States, and it is only sensible that people who claim that they have a mechanic's lien should record them. You can always find a county that does not go to sea and float away to Turkey. There are only about 80,000 or 90,000 international big ships in the world. There are not a great many, and they are all recorded annually in the American Register and Lloyds Register *and you can find out all about them.* We have an organized system through the American Bureau of Shipping. You can look every week in the English weekly journal Fair Play and see the list of all the boats in repair yards being repaired. There are not so many. *It is not too hard for a man who gets a repair job offered him on a foreign ship to look into the books and into the current weekly to find out, as a practical proposition, whether he is subjecting himself to a lot of prior liens, or whether he is not.* There are only a small number of these ships related to the number of houses, and it *is not difficult in practice to find out, and we do find out every day.*

"I have only seen one man up in Maine who neglected to find out in Boston about 5 years ago. He went ahead and repaired a boat, $40,000, and then it occurred to him that perhaps he better look to the customshouse. And where was it? It was in Boston, and he found there was a mortgage ahead of him for $45,000, and he was very, very sorry. He is the only goat I have observed in over 20 years, so it is not an impractical problem." (Hearing on H.R. 6276, 83d Cong., 2d Sess. pp. 10–11).

12. Pertinent legislative history is set out in Atlantic Steamer Supply Co. v. The Tradewind, supra, 141 F.Supp. at pages 420–421, footnotes 19 and 20.

mortgage having *statutory priority* over their maritime liens.

■ That Smith, being chargeable with notice, can not assert a lien for damages arising out of tort is further manifested by certain provisions of the Ship Mortgage Act, 1920, dealing with failure to disclose encumbrances upon vessels of the United States. Section 941 (a) of Title 46 U.S.C.A. provides that *willful failure* on the part of the master to exhibit the vessel's documents or a copy of the preferred mortgage may result in the suspension or cancellation of his license. Section 941 (b) states a mortgagor who, *with intent to defraud,* fails, *upon request,* to disclose in writing to the mortgagee before the execution of the mortgage any prior encumbrances upon the vessel or incurs, without the consent of the mortgagee, before a reasonable time has passed after the execution of the mortgage for the recording and endorsement of the mortgage on the ship's documents, any contractual obligation[13] creating a lien upon the vessel shall be guilty of a misdemeanor and, if the mortgagor is a corporation, its president or other principal executive officer shall be subject to prosecution. Section 941 (c) is most pertinent to the present case.

"If any person enters into any contract secured by, or upon the credit of, a vessel of the United States covered by a preferred mortgage, and suffers pecuniary loss by reason of the failure * * * of the mortgagor, or master of the mortgaged vessel, or any officer, employee, or agent thereof, to comply with any provision of section 923[14] or 924[15] of this title, or to file an affidavit as required by subdivision (a) of section 922[16] of this title, correct in each particular thereof, the mortgagor shall be liable to such person for damages in the amount of such loss. The district courts of the United States are given jurisdiction (but not to the exclusion of the courts of the several States, Territories, Districts, or possessions) of suits for the recovery of such damages, irrespective of the amount involved in the suit or the citizenship of the parties thereto. Such suit shall be begun by personal service upon the defendant within the limits of the district * * *.''

Since the failure to comply with the provisions of sections 922, 923 and 924 would most often, if not always, arise from negligent or fraudulent conduct on the part of the one charged with the statutory duty of giving notice as to the ship's financial condition, it is not entirely without significance that Congress in section 941 (c) failed to indicate, or to reserve, any right on the part of one injured to proceed in rem against the vessel for such tortious conduct. Section 954 (a) creating upon default a cause of action in personam in admiralty for the outstanding mortgage indebtedness recites this type of relief as being an additional remedy. Section 974 dealing with

13. Contractual liens are permitted fo wages of stevedores when employed directly by the owner, operator, master, ship's husband, or agent of the vessel; for wages of the crew of the vessel; for general average; and for salvage.

14. Section 923 requires exhibition of the documents of the vessel and of a certified copy of the mortgage to one having business with the vessel which might give rise to a maritime lien.

15. Section 924 relates to the mortgagor's duty to disclose to the mortgagee before the execution of the mortgage any prior

encumbrances on the vessel and the mortgagor's duty to allow a reasonable time, after the execution of the mortgage, for the recording and endorsement of the mortgage before incurring contractual obligations creating a lien upon the vessel.

16. Section 922(a) (3) provides that an affidavit must be filed to the effect that the mortgage is made in good faith and without any design to hinder, delay, or defraud any existing or future creditor of the mortgagor or any lienor of the vessel.

waiver of a lien, provides that the Ship Mortgage Act, 1920, shall not be construed as affecting the law as it existed on June 5, 1920 in regard to, among other rules of law, the right of a lienor to proceed in personam. Under the familiar maxim of "expressio unius est exclusio alterius" and in view of the fact that Congress knew, and used, language indicative of alternate remedies when such existed, it must be concluded that mere failure, even upon request, to exhibit the documents of the vessel and a copy of the preferred mortgage[17] to one having business with an American documented vessel which might give rise to a maritime lien does not and can not, of itself, create a lien for damages arising out of tort. A fortiori, no such lien arises in favor of a foreign supplier of a foreign vessel, the Ship Mortgage Act, 1920, as amended, in no way indicating an intent to afford foreign suppliers of foreign vessels relief not available to suppliers of American vessels. The Oconee, supra, specifically reserved from consideration the effect of a willful misrepresentation on the part of the master of the vessel. Likewise this court, under the facts as now alleged, does not reach that issue.

In the Libel of Pilgrim Trust Co. v. Frances C. Denehy, supra, the court considered the effect of a valid preferred mortgage from the standpoint of a balancing of equities, the repairer lien holder forcefully arguing that, as the vessel has been substantially and materially improved by its repair work, to allow the lien of the preferred mortgage to attach to the entire fund as distinguished from the value of the vessel before the repairs were initiated would result in an unjust enrichment of the mortgagee. The court in denying the repairer recovery on the basis of its failure to ascertain the existence of prior encumbrances and on the basis of the declared purpose of the Ship Mortgage Act, 1920, to make ships' mortgages desir-

able investments, explained, 94 F.Supp. at page 815, as follows:

"In The Favorite, D.C.S.D.N.Y., 1940, 34 F.Supp. 324, Judge Conger states, 34 F.Supp. at page 328, the theory behind this burden of inquiry on the part of one dealing with a vessel: 'One dealing with the ship, either in her home port or abroad, can easily ascertain whether or not there is any encumbrance on the vessel. It is his duty to so do. Should he fail, he does so at his own peril. If an inspection of the ship's papers discloses to a repairman or a contractor that there is a preferred mortgage on the ship, he deals with the ship with full knowledge, if it appears that the maturity date has passed, and no certificate of discharge is endorsed on the mortgage. He has, at least, notice that he should inquire further. He is, at least, dealing with the ship with his eyes open. See Robinson on Admiralty, 1939, pg. 452, where it is stated: "If he feeds the mortgage elephant without inquiring, he is in the same position as if he has fed the animal knowingly. This inversion of the admiralty rule will tend to make the supplyman demand cash; and in the long run the mortgagee, as he has had to do often enough in shore mortgages, may have to feed his own elephant by paying for the supplies, etc., himself as an alternative to forcing the ship to lay up." ' "

An examination of The Henry W. Breyer, supra, principally relied upon by Smith, indicates it is authority for this court's conclusion that Smith can not build its maritime lien as a supplier or furnisher of services into a preferred maritime lien for damages arising out of tort. The court in that case, after having considered the shippers' claims, then turned its attention to other claimants. Stevedoring services and supplies had been furnished the vessel after the execu-

17. Footnote 11, supra, indicates what steps, as a practical matter, may be taken by the supplier to learn of the existence of prior encumbrances.

tion of the preferred mortgage and its endorsement upon the ship's papers during the period when the corporate owner was insolvent and the vessel unable to satisfy the encumbrances against her.[18] Under Smith's interpretation of the case, the contracting stevedore and the supplier would clearly be entitled to preferred maritime liens, yet the court construing both subsection P[19] and subsection M[20] of section 30 of the Ship Mortgage Act, 1920, denied preferred maritime liens to both claimants failing even to mention, in the case of the contracting stevedore,[21] the possibility of such a lien arising out of tort. The court in passing on the supplier's claim, said, 17 F.2d at page 432:

> "Undoubtedly the claimant is entitled to a lien on the ship for the coal furnished under subsection P of section 30 of the Ship Mortgage Act of 1920, providing that any person furnishing supplies or other necessaries to a vessel shall have a maritime lien thereon. The sole question is whether this lien has priority over the lien of the preferred mortgage. It is clear that it is not one of the preferred liens under the terms of subsection M, since it did not arise prior to the recording and indorsement of the mortgage, *nor did it arise out of tort,* wages of stevedores or crew, or general average or salvage." (Emphasis supplied.)

Likewise under the facts of this case, as a matter of law Smith may not claim a preferred maritime lien for damages arising out of tort, and its maritime lien as a foreign supplier of a foreign vessel is subordinated, under the provisions of section 953, to the lien of the preferred mortgage.

### Claim of Larrabee Associates.

Larrabee Associates (Larrabee), a partnership engaged in the advertising business, asserts its right to a maritime lien under the provisions of section 971 of Title 46 U.S.C.A. Counsel for Larrabee and for the mortgagee, exceptant to this claim have stipulated [22] as to the nature of the services rendered as follows:

18. A preferred mortgage for $112,500 was executed on December 30, 1925. The first payment thereunder of $37,500 due December 30, 1925 and the second payment of $25,000 due February 15, 1926 were not met. The claims of the shippers arose between February 12 and 23, 1926; the claim of the contracting stevedore being for services rendered on February 4 and March 9, 1926, and the supplies having been furnished on January 13, 1926. The original libel against the vessel was filed on March 4, 1926, and she was sold on April 8, 1926 for $64,-000.

19. Subsection P is codified as section 971 of Title 46 U.S.C.A. and was the statutory provision under which Smith asserted its claim to a maritime lien in the original intervening libel.

20. Subsection M is codified as section 953 of Title 46 U.S.C.A. and is the statutory provision under which Smith now asserts its claim to a preferred maritime lien in the amended intervening libel.

21. The court's reasoning in denying the contracting stevedore a preferred maritime lien "for wages of a stevedore when employed directly by the owner" etc. was directed toward the distinction between the legal rights and liabilities of an individual laborer and of a contractor who funishes such laborers. In this connection and for the purposes of this case as regards who is charged with notice of a preferred mortgage, see The Owego, D.C.E.D.La.1923, 292 F. 403, 407:
    "Congress evidently intended to protect the actual laborer and to put him on a par with seamen. The reason for this is clear. A laborer could not be expected to make inquiry and to inspect the ship's papers before doing a day's work.
    "The same reason does not apply to a contracting stevedore. He is in the same position as materialmen and repairmen whose liens are not preferred to a prior mortgage, and he is entitled to no greater rights."

22. This summary of the stipulation appears in the mortgagee's brief and is admitted in Larrabee's brief to be accurate.

"Stickers and matches delivered to the Tradewind for use on the vessel (paragraph 2 of the stipulation) _____ $313.72

"Floor plans of the vessel delivered on board and available for passengers' use (paragraph 3 of the stipulation) __ 75.10

"Advertising folders delivered to the vessel and available for passengers' use (paragraph 4 of the stipulation) _____ 1,171.00

"Retouched photographs used for promotional purposes in connection with a party held on board the vessel (paragraph 5 of the stipulation) _____ 93.98 [23]

"A 'Welcome Home' advertisement appearing in a Washington paper (paragraph 6 of the stipulation) _____ 1,560.50

"Balance for general advertising services and expenses incurred (paragraph 7 of the stipulation) _____ 14,322.32

Total _____ $17,536.62" [24]

Both the Federal Maritime Lien Act and the admiralty court decisions, subsequent thereto, require for the granting of a maritime lien that the services or supplies herein involved be *necessaries* and be *furnished to the vessel.* The origin of the maritime lien lying in the personification of the ship herself, it is not surprising to find necessaries most frequently defined by reference "to the character of the voyages or the employment in which the vessel is being used, nor that a more inclusive construction of the term has had to be adopted, as the uses to which vessels are put and the purposes for which they are employed have come to be more various in character." The Satellite, D.C.Mass. 1910, 188 F. 717, 720; accord: The Sterling, D.C.W.D.Wash.1916, 230 F. 543, 543–544; The Penn (The Lord Baltimore), 3 Cir., 1921, 273 F. 990, 991; Walker-Skageth Food Stores, Inc. v. The Bavois, D.C.S.D.N.Y.1942, 43 F.Supp. 109, 110. Necessaries are considered, as the wording of the Act itself indicates, as being more in the nature of supplies than services. The Henry W. Breyer, supra, 17 F.2d at page 431, noting that it was still open to question whether or not stevedoring services were included among necessaries; The Princess, D.C.S. D.N.Y.1926, 12 F.2d 808, denying a broker a lien for his services in shipping a crew for the vessel; Vlavianos v. The Cypress, 4 Cir., 1948, 171 F.2d 435, 440, certiorari denied 1949, 337 U.S. 924, 69 S.Ct. 1168, 1171, 93 L.Ed. 1732, denying a seaman a lien for expenses incurred and advances made to enable a captain to return to his ship. That the necessaries are furnished to the vessel only when they are ordered for a particular vessel and thereafter are either actually put on board or brought within the control of the ship's officers is settled law. Piedmont & George's Creek Coal Co. v. Seaboard Fisheries Co., 1920, 254 U.S. 1, 8–9, 12, 41 S.Ct. 1, 65 L.Ed. 97; The Denelfred, D.C.E.D.Mich.1932, 59 F.2d 213, 214; The American Eagle, D.C.Del. 1929, 30 F.2d 293, 295. No "lien arises in admiralty except in connection with some visible occurrence relating to the vessel * * *. This is necessary in order that innocent parties dealing with vessels may not be the losers by secret liens, the existence of which they have no possibility of detecting by any relation to any visible fact." The S. L. Watson, 1 Cir., 1902, 118 F. 945, 952; accord: Osaka Shosen Kaisha v. Pacific Export Lumber Co., 1923, 260 U.S. 490, 500, 43 S.Ct. 172, 67 L.Ed. 364; Todd Shipyards Corporation v. The City of Athens, supra, 83 F.Supp. at page 75.

The stipulation of counsel as to the statement of account of Larrabee can at once be broken into two categories, the first being charges incurred for general advertising services including a "Welcome Home" advertisement appearing in a Washington paper; and the second being charges incurred for supplies delivered to, and placed on board, The Tradewind for use by her passengers. The

---

23. Should be $93.38.

24. Should be $17,536.02.

contention that the general advertising services rendered were reasonably needed in the ship's business in that the promotional activities of Larrabee put people on board the vessel is without merit. Cases refusing an insurance company a lien for unpaid insurance premiums are analogous, insurance being most necessary to the successful operation and maintenance of a vessel, but "such a contract does not aid the vessel. It inures solely to the personal interest of the owner. Unlike contracts and engagements in which every lienholder has an interest, because they fortify his security, the contract of insurance contributes to no fund for the general benefit, and its fruits are monopolized by the owner." Insurance Co. of Pennsylvania v. Proceeds of Sale of Barge Waubaushene, C.C.N.D.N.Y.1885, 24 F. 559, 560. The advertising services were not necessary to the conduct of the ship's business as distinguished from her owner's business, nor were these services furnished to the "vessel" as that term has been defined by admiralty courts. In Turner v. The Havana, D.C.S.D.N.Y.1893, 54 F. 201, 203–204, affirmed without discussion of this point in The Havana, 2 Cir., 1894, 64 F. 496, the district court held as follows:

"The loan by him of $200 to Schrader for the purpose of paying necessary bills for advertising in newspapers the excursions of the steamer, in order to keep up her business, cannot be allowed; because such advertising was not a service rendered directly to or upon the ship, but belonged to that preliminary class of services rendered wholly on land and not deemed maritime, and hence not giving rise to any maritime lien. See The Thames, 10 Fed.Rep. 848; The Crystal Stream, 25 Fed.Rep. 575; The Paola R., 32 Fed.Rep. 174; Doolittle v. Knobeloch, 39 Fed.Rep. 40; Marquardt v. French, 53 Fed.Rep. 603."

A lien claim for newspaper advertisements concerning the voyages of the vessel was likewise denied in The Steamboat Monarch v. M. D. Potter & Co., 1857, 7 Ohio St. 457.

In considering the second category of charges incurred for articles actually placed on board The Tradewind, the sole question becomes whether or not these articles might reasonably be "supposed to meet the ordinary wants of the class of passengers expected * * * whether strictly essential to their safety and comfort or not". The Satellite, D.C. Mass.1910, 188 F. 717, 720. The mortgagee does not seriously oppose the granting of a lien as to the baggage stickers and the matches. This court is unable to distinguish between the utilitarian value of, or necessity for, stickers and matches and the floor plan of the vessel, the folders containing information useful to the passengers, and the retouched photographs. All were supplied to the passengers for their advertising value to the owner of the vessel, but all served the wants of the passengers either as souvenirs or sources of information as to the vessel and its voyage. Similar articles including bills of fare, bill heads, notice to consignees, advertising cards and posters furnished to the vessel were held to give rise to a maritime lien in The Steamboat Monarch v. M. D. Potter & Co., supra. This court, accordingly, holds that the charges incurred for the supplying of stickers, matches, floor plans, advertising folders, and photographs to the vessel for use by her passengers are secured by a lien against The Tradewind.

The mortgagee has urged under the "first in-first out" rule that the lien claims of Larrabee originating prior to July 1, 1955, were satisfied by payments received on account, so that Larrabee's lien for articles supplied the vessel, rather than being in the sum of $1,653.20, can not exceed $669.85 which represents the supplies furnished after June 30, 1955. That rule is not applicable to the present case, for the law presumes in the absence of proof to the contrary that a creditor having both a secured claim and an unsecured claim in-

tends to allocate any part payment made to the unsecured debt. The Home, D.C. W.D.Wash.1946, 65 F.Supp. 94, 95; Field v. Holland, 1810, 6 Cranch 8, 10 U.S. 8, 28, 3 L.Ed. 136; A.L.I. Restatement, Contracts, section 394 (1) (b) (ii), p. 743, illustration 5, p. 746.

The claim of Larrabee is allowed in the amount of $1,653.20 as a maritime lien, which lien being for necessaries supplied in the United States to a foreign vessel is given priority, under the provisions of section 951, Title 46 U.S.C.A. over the lien of the preferred mortgage.